NELLIE COPELAND, Administratrix of the Estate of JOHN W. HERTZ, Deceased, v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant.—No. 38934.—182 S. W. (2d) 600.

Division One, September 5, 1944.

Rehearing Denied, October 9, 1944.

434

*Joseph A. McClain, Jr.,* and *Arnot L. Sheppard* for appellant.

*Erwin B. Tucker* and *Cyrus A. Geers* for respondent.

436

DALTON, C.—Action under the Federal Employers' Liability Act (45 U. S. C. A., Sec. 51, et seq.) to recover damages on account of the death of plaintiff's decedent, John W. Hertz. Verdict and judgment went for plaintiff for $10,000 and defendant appealed.

On the night of December 16, 1941, Hertz was employed as a rear brakeman on defendant's freight train, which was engaged in a switching operation in defendant's yards in St. Clair County, Illinois.

The particular operation was to "spot" the rear four cars (boxcars) of a 25 car train on track barges of the Federal Barge Line. The cars were to be placed on "spots" numbered 2, 3, 4, and 5, adjacent to an unloading platform on the west side of the barges. These "spots" or spaces were about 40 feet in length and were numbered from the south end of the barges. No. 1 "spot" was empty. There were two track barges anchored end to end along the east side of the Mississippi river, with two warehouse or dock barges anchored immediately on the west side thereof. The railroad tracks extended generally north and south, came down a rather steep incline along the east bank of the river, first at a 1.59% grade and then at a 3.5% grade, then up a rather steep grade on what is referred to as a cradle (a moveable track carrying device), and then out level onto the track barges, which would hold 12 cars. There were two railroad tracks on the barges. The clearance between cars on the two tracks was 3 feet, but on this occasion there were no cars on either track and the four cars were to be spotted on the west track, immediately adjacent to the unloading platform, the edge of which came to within 3 or 4 inches of the grab irons on the west side of the cars. The floor of the unloading platform was about even with the floor of the freight cars, when spotted adjacent thereto. On this occasion, the train was backed in a southerly direction down the river bank, across the cradle and onto the track barges. The train was stopped as it came down the river bank and the air brakes were tested before any cars reached the barges. Later, the four cars were stopped 10 or 12 feet further south than was intended and, on signal the train moved ahead, but only enough to "stretch the slack," when the dock foreman for the Barge Line approved the location of the four cars, and they were left where they had been stopped.

When the train backed in on the barges, Thomas J. Dailey, the foreman in charge of the train crew, was on the fourth car from the rear. Hertz, the rear brakeman, and one Asselmeier, a student brakeman under him, were standing on the rear end of the train. Hertz and Asselmeier got off the train onto the unloading platform and walked north to the south end of the fifth car from the rear of the train. Hertz then got off the platform and down between the 4th and 5th cars (a 3 to 4 foot space, "or maybe better," even when shoved together) and stood on the ties west of the drawbars to "cut off" the four cars. The ties were somewhat imbedded in the cement barges, but the spaces between the ties were not entirely filled. Hertz then closed the angle cocks on the two cars (reaching over to close one) and "broke" the hose, between the two cars. He next opened the angle cock on the rear one of the two cars, let the air out and set the air brakes on the four rear cars. Asselmeier remained on the platform. Dailey then moved to the fifth car from the rear of the train, walked to its center and waited for a signal from Hertz.

Hertz stood between the cars "to lift the pin" that has to be lifted to release the knuckle or coupler, so that it would open and the four rear cars could be cut off from the rest of the train. The "slack being out," the pin could not be raised, so Hertz called to Dailey to give him a little slack. Dailey signaled the head brakeman (who stood on the fourth car back of the engine) for slack and the head brakeman signaled the engineer. The maximum slack between any two cars is about 8 to 10 inches, four or five inches for each end of each car (taken up by springs). Asselmeier, standing on the platform, was looking down at Hertz, who was facing east between the cars and was standing west of the coupling "trying to catch the pin when slack came." When the cars of the train moved back and slack came, Hertz' left arm was caught, between the side of the fifth car and the face of the loading platform, and he was rolled in between the fifth car and the platform and instantly killed. When the train movement stopped, Hertz was about half way of the grab irons of the ladder on the west side of the boxcar, near its south end. The grab iron ladder was located on the side of the car only 3 or 4 inches from the south end, so Hertz was wedged in along the side of the car about 1 to 1½ feet from the corner of the car.

There was evidence that a person in Hertz' position, calling for a little slack, could have reasonably expected about 8 or 9 inches of slack and in about five minutes after signal. On this occasion, when the slack movement came, it moved the four cars to the south of Hertz, a distance of at least 12 feet. "It didn't move like the hands of a clock . . . just took a second or so and it was over," and Hertz "never uttered a sound." There was also evidence that, with a 25 car train in the situation this train was in, the engineer could not limit the movement of the cars to 8 inches, and that a movement of 1 to 4 feet would not "be out of line in those conditions," but a 12 foot movement would be an unusual movement for slack. The death of Hertz at the time and place mentioned, and while engaged in interstate commerce, was admitted. Other facts will be stated in the course of the opinion.

Appellant assigns error on the court's refusal of its peremptory instruction at the close of all the evidence and contends that no case was made for the jury because (1) "decedent's own gross negligence, in choosing and remaining in a place of certain and extreme peril, solely and proximately caused his death"; and (2) "the only negligence submitted to the jury in instruction No. 1 requested by respondent ('that defendant's said employees then and there in order to give such slack caused said train to move with unnecessary and unusual force and speed') was not the proximate cause of decedent's death." Appellant says that "decedent voluntarily and intentionally accepted the hazard of standing between the ends of two cars at a point where there was insufficient clearance between the dock platform

and the sides of the cars, while he called for the movement of the cars.'' Appellant further contends that the evidence shows no negligence on the part of the appellant and that, if it does, such negligence was not the proximate cause of decedent's death. Appellant's theory is that ''Hertz was caught and killed by a common, ordinary movement''; that the evidence showed that ''the force and speed of the slack movement (even if a 12 foot movement and as a result of appellant's negligence) had nothing ▆ whatever to do with decedent's death''; that Hertz ''got caught just as soon as the movement started'' and before the car had moved any further than 3 or 4 inches at the most; that he was crushed to death when the car had moved not more than a few inches in response to his own orders; that he should have gotten to a place of safety; and that the distance of the movement became immaterial, and force and speed dropped out of the case. Appellant relies upon a literal interpretation of the testimony of a witness for defendant, who used the words ''caught just as soon as the movement started,'' and appellant insists that the witness' testimony is ''uncontradicted, unimpeached and unattacked in any way'' and his conclusion is binding upon the trial court and upon respondent. The evidence, however, is not as limited as appellant contends and inferences, other than those mentioned, may be drawn from the evidence.

▆ Was Hertz guilty of negligence as a matter of law and was his negligence the sole proximate cause of his death as a matter of law? Appellant concedes that the air brakes were set on the four southernmost cars of the train; and that ''it would have taken terrific force applied to those four cars to move them any appreciable extent.'' But appellant assumes that ''decedent did not remain between the ends of the fifth and fourth cars,'' but ''in some manner, and for some inscrutable purpose he stepped or stood in such manner that the corner of the fifth car caught him the very instant that it moved.'' However, there is absolutely no evidence that Hertz moved from his position between the two cars, facing east, waiting to lift the pin. There is no evidence from which an inference can be drawn that he changed or attempted to change his position prior to the slack movement.

Hertz had been a switchman for appellant for five years and, for more than a year, had been a member of this train crew and had made this same switching movement practically every night. Asselmeier was working as a student and Hertz was showing him how to become a switchman. Hertz got down from the loading platform and stood between the ends of the boxcars, and stood there to cut off the four cars by pulling the pin and letting the knuckles uncouple. Dailey, the foreman of the crew, saw Hertz there and left him there, when he (Dailey) went to the center of the top of the fifth car to await a signal from Hertz. Hertz called for a little slack and under the

circumstances he could reasonably expect only 8 or 10 inches of slack. Dailey admitted that he made no objection to Hertz' position, but said "I figured he knowed his business, and figured he knowed what he was doing that way." Dailey also said that he "figured" Hertz would get over on the right side of the train by crossing over the top of the train or over or under the drawbars, so as to stand on the east side of the train, between the two tracks. He said that this was the first time he ever saw a man work on the west side; that the proper place to stand was on the right side; and that, if Hertz had been there, he could not have been hurt. Dailey further testified that a man, standing where Hertz stood, could take care of himself on a 2 or 3 foot movement; that he could walk with the cars, if the cars didn't come too fast; and that there was a ladder there on the end of the car he could have pulled himself up on; but that if the cars came too fast they would hit him; or he could be caught between the cars and the platform. The head brakeman testified that he had never seen anybody cut the cars from the west side, but later said he had tried it himself and "got run out of there." The head brakeman further said that he thought he could have taken care of himself even on a 12 foot movement.

The foreman for the Barge Line testified that, after Hertz was killed, he saw a half dozen switchmen trying to uncouple cars from the west side of the train, and he ran them out and wouldn't let them make the cut on that side.

Appellant has cited many cases holding that (in view of the facts in the particular case) the injured servant's act in placing himself in a position of known, certain and extreme peril was the sole proximate cause of his injury or death. Appellant insists that these cases support its position that Hertz was negligent and that his negligence was, as a matter of law, the sole proximate cause of his death. We think the cases are not applicable under the facts of this case.

From the evidence most favorable to plaintiff, we think the jury could draw the inference that there was no certain danger or extreme peril, nor even negligence, in the manner in which Hertz was proceeding to lift the pin; that his conduct was not the sole proximate cause of his death; and that he would not have been injured or killed, except for the negligence, if any, of defendant's employees in moving the train, a matter we now consider.

 Appellant's argument, that there was no evidence of its negligence consists primarily of an assault upon the testimony of John Mulvaney, plaintiff's witness, concerning the 12 foot movement for slack, which the evidence showed was unnecessary and unusual.

Immediately after the train stopped, Mulvaney, the night general foreman for Federal Barge Lines came out on the loading platform, approved the location of the four cars and then opened the door of the third car from the rear of the train (near No. 4 "spot") and looked

to see "how the freight was put in it." He then went to the south car (near No. 2 "spot") and opened the door of this car. When this car door was fully open, he was standing on the platform, near the south door post of the car, and the north door post passed him going south and when the car stopped he "was practically in the center of the north end of the car" and the cars had moved at least 12 feet. He "looked to see what happened, looked up north and saw a switchman on the platform giving the washout sign" and then ran north and saw Hertz' body crushed between the boxcar and the unloading platform. In answer to a question concerning the speed of the movement, the witness said, "Well, it didn't move any too fast for the simple reason if he had moved too fast he would have probably hit the bumper post at number 1 'spot' After the slack movement, the end of the train lacked 16 to 18 feet of extending to the south end of No. 1 'spot.' "

Other witnesses contradicted Mulvaney's testimony, as to the extent of the slack movement, and fixed it at 8 inches to 4 feet and as "not unusual." There was evidence to the effect that foreman Dailey, and head brakeman Newton, would have been knocked down or off the train by such a 12 foot movement; that the four cars could not have been moved "any distance to amount to anything" with the brakes on; that the engineer only released the brakes and let the steep incline pull the engine and cars down; that the engine moved only 6 to 8 inches before the brakes were set; that, after the engine moved back, the engineer set the brakes on the engine and tank; that he didn't know whether the brakes were set on the cars or not; that it would have required power and a terrific crash to move the four cars 12 feet; and that the engine "would have had to move ahead some distance, then take a run" and "butt them back."

Appellant argues that Mulvaney's testimony concerning the 12 foot slack movement is wholly unworthy of belief; that it is contradicted by the testimony of every other witness; that "it is directly contrary to well known physical facts"; that it is common knowledge that these four cars could not possibly have been moved a distance of 12 feet; and that testimony to the contrary is directly in the face of physical facts and man's daily experience. Appellant assumes, as a matter of law, the truth of the testimony of defendant's witness that no power, other than the force of gravity, was applied in making the slack movement. Appellant says that " 'force' means the violence with which the cars were moved"; that, " 'speed' means the rapidity with which the cars moved"; that, under plaintiff's submission, the jury was required "to find that the movement was made with both 'force and speed,' both of which were unnecessary and unusual"; and that the evidence in the record was wholly insufficient to show either.

It will be unnecessary to further review the evidence considering Hertz' position before the movement, his position afterwards, the testi-

mony concerning the conditions and movement of the four cars and other facts, from which, considered favorably to the plaintiff, an inference can be drawn that the slack movement was made with "unnecessary and unusual force and speed." The issue of appellant's negligence was for the jury, unless it appears, as a matter of law, that such negligence was not the proximate cause of decedent's death, which matter we now consider.

 As stated, appellant contends that Hertz was killed by a slack movement of a few inches, of less extent than an ordinary movement; and that the excess force, speed and distance, if any, was not a proximate cause of his death. Considered favorably to plaintiff, as we must, the evidence tends to show that Hertz, standing in the space between the 4th and 5th cars from the rear of the train, with the air brakes set on the rear four cars so that they could be moved only by terrific force, was in no particular danger from the slack movement, which he could reasonably expect would be about 8 or 9 inches, or the slack between the two cars. It was to be expected that the force applied would not be sufficient to move the four cars "any appreciable distance." Even if the slack movement was several feet, and the force sufficient to move the four cars that distance, he could walk with the cars, or grab the ladder on the end of the car, unless the cars came too fast, or fast enough to hit him or throw him between the cars and the platform. Since he was standing between the cars, immediately west of the drawbars, waiting to lift the pin when slack came, he was in no danger from the platform, unless thrown into it by a negligent movement of the train. The space between the cars, with the slack out, was in excess of 4 feet and we can, therefore, infer that Hertz was some 2 feet or more from the south end of the 5th car. He was caught and rolled between the side of the 5th car and the platform. When the train stopped, his face was toward the platform, he was wedged in about 1 foot or more from the corner of the car, and so that his feet were about 1½ feet from the ties; and there was nothing to show how far the body had been moved along the front of the platform. Appellant concedes it would have required a terrific force to move the four cars and we hold that a jury could infer from the facts in evidence that the force, which moved the four cars 12 feet or more, was applied with unusual and unnecessary speed; that the initial force and speed of a slack movement, which would move the four cars (with brakes set) a distance of 12 feet, was much greater than the initial force and speed of an ordinary slack movement of 8 inches to 4 feet; and that, except for such excess force and speed, Hertz would not have been caught and killed. Appellant was liable under the act for "injury or death resulting in whole or in part" from its negligence. We think the issue of proximate cause was for the jury. See, Chicago, R. I. & P. Ry. Co. v. Calloway, Administratrix (Okla.), 291 Pac. 111, 113. Peti-

tion for writ of certiorari denied. Chicago, R. I. & P. Ry. Co. v. Calloway, Administratrix, 282 U. S. 894. The request for a directed verdict for defendant was properly refused.

Appellant assigns error on the giving of plaintiff's instruction 1. It is contended (1) that the record fails to show unusual force or speed; (2) that such force and speed, if any, was not the proximate cause of the death; (3) that "the petition does not charge appellant with moving the cars with unnecessary and unusual force and speed"; and (4) that the instruction was broader than the petition and the proof and entirely beyond the scope of either. The first two propositions have been ruled against appellant, but here appellant particularly insists that there was no evidence of unnecessary and unusual speed; and that the four cars could not have been moved with "any degree of speed." We have held that unnecessary and unusual speed could be inferred from the facts and circumstances in evidence, including the manner in which Hertz was caught and killed. We now consider the third proposition presented. While the negligence submitted by the instruction does not expressly follow the language or detailed factual allegations of any particular one of the several paragraphs charging negligence, we think that the negligence submitted was clearly within the general scope of the negligence alleged in the petition. Plaintiff alleged that, "defendant's said foreman, servants, and agents, then in charge of said train, carelessly and negligently caused and permitted defendant's said train to be suddenly and unexpectedly backed with great force and violence, thereby carelessly and negligently causing plaintiff's intestate to be caught and lodged between defendant's said train and the loading platform of said Federal Barge Line." The petition further alleged that "the defendant, its said foreman, servants, and agents, carelessly and negligently caused and permitted the air brakes on its said train to be released, thereby carelessly and negligently causing and permitting defendant's said train to move backward with unusual speed, and to catch and lodge plaintiff's intestate between defendant's said train and the loading platform." There were also other allegations of negligence in the same count. The evidence heretofore reviewed was admitted without any suggestion that it was not within the issues made by the pleadings. The petition will be considered amended to conform to facts admitted in evidence without objection. Ilgenfritz v. Missouri Power & Light Co., 340 Mo. 648, 101 S. W. (2d) 723, 726, and cases cited. The assignment is overruled.

Appellant further assigns error on the refusal of its instruction F purporting to leave to the jury "the question of whether or not decedent's sole negligence was the proximate cause of his injury." Appellant insists that the facts upon which this instruction is based "are all undisputed"; and that the refusal of the instruction was reversible error. The instruction in effect assumes, without

requiring a finding, that Hertz attempted to stand in "the space between the dock platform and the side of a boxcar"; and that he was injured because he attempted to stand there. In addition, there was no evidence to sustain such finding, if it had been required by the instruction. The evidence is that Hertz stood *between the ends* of the 4th and 5th cars. There is no evidence that he stood or attempted to stand any place else. Appellant so concedes by argument that Hertz "did stand between the ends of two freight cars, knowing the lack of clearance between the edge of the dock loading platform and the side of a freight car." If the instruction was intended to submit merely the question of decedent's negligence in failing to move from the west side of the coupler to the space between the two tracks on the east side of the train, the instruction was clearly misleading. But the instruction was further defective. It began as follows: "You are instructed that the law demanded of John W. Hertz at the time of his injury, the exercise of ordinary care for his own safety. A failure, if any, on his part to exercise such care constituted negligence." In so stating an abstract principle of law the instruction was likely to lead the jury to believe that they should return a verdict against plaintiff, if Hertz failed to exercise ordinary care for his own safety. Reiling v. Russell, 348 Mo. 279, 153 S. W. (2d) 6, 7. Contributory negligence was not a bar to recovery under the Federal Employers' Liability Act and, as far as plaintiff's case was concerned, the law did not "demand of John W. Hertz . . . the exercise of ordinary care for his own safety." Plaintiff could recover even if Hertz was guilty of contributory negligence, since such contributory negligence could only affect the amount of plaintiff's recovery. 45 U. S. C. A., Sec. 53. The instruction was properly refused.

Appellant assigns error on the argument of counsel and says: "Respondent's counsel committed reversible error by insisting upon arguing to the jury the fact that foreman Dailey knew where decedent was and failed to order him to get out of the way, despite the fact that the case was not submitted upon that issue and despite the further fact that the court repeatedly cautioned counsel not to make such an argument." The record shows that appellant's one objection to the argument was sustained. Appellant asked no further relief of any kind. So far as the record is concerned, appellant appears to have been entirely satisfied with the way the trial court handled the matter at the time by admonishing counsel from time to time to stay within the record. The record fails to show any erroneous ruling or prejudice to appellant.

Appellant finally contends the verdict is excessive. Hertz was 27 years old, in good health, working steady and earning $200 per month. At that age he would normally have had an expectancy of 37 years, except for his hazardous occupation which reduced his expectancy 20 to 30 percent. His sole surviving heir was a daughter,

who was five years of age and was living with her mother and grandmother at the time of the trial. Hertz had been divorced from the child's mother, but had not remarried. Under the terms of the divorce decree, he was directed to pay and was paying $5.00 per week for the support of his child. The child had been in his care part of the time and he had bought clothes for her. The measure of damages under the act is compensation for the loss of pecuniary benefits which the child might reasonably have received from her father, if he had not been killed, that is, the present cash value of such future benefits. 45 U. S. C. A., Sec. 51. Appellant suggests that the total payments under the divorce decree for support and maintenance will only amount to $4180 by the time the child becomes of age, and since "the damages recovered in this character of case are wholly compensative for pecuniary losses sustained" the judgment is excessive. The amount of pecuniary benefits, which the child might reasonably have expected to receive from her father had he lived, may not be limited on the assumption that the allowance for the child's support by the divorce decree, includes all benefits that the child would receive from her father. The amount had not been so limited since the decree of divorce and it may not be assumed that the allowance for support would not have been changed as the child advanced in age and her need ▮▮▮ for additional funds for support, maintenance and education increased. "There is no yardstick by which to accurately measure the size of a verdict which this court will approve in death cases arising under the Federal Employers' Liability Act." Sibert v. Litchfield & M. Ry. Co. (Mo. Sup.), 159 S. W. (2d) 612, 619. Considering, however, the probabilities in the case we are of the opinion that the verdict in this case is not excessive.

Finding no reversible error in the record, the judgment is affirmed. *Bradley* and *Van Osdol*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.