FLOSSIE FORD, Administratrix of the Estate of BERT FORD, Deceased, v. LOUISVILLE & NASHVILLE RAILROAD COMPANY, a Corporation, Appellant.—No. 39694.—196 S. W. (2d) 163.

Division Two, September 9, 1946.

*Wilton D. Chapman* for appellant; *Sidney Smith* and *James J. Donohue* of counsel.

364

*Mark D. Eagleton* and *Wm. H. Allen* for respondent.

TIPTON, J.—This is an action brought under the Federal Employers' Liability Act by Flossie Ford, administratrix of the estate of Bert F. Ford, who was run over and killed by appellant's freight train on which he was head brakeman on November 15, 1940, at Pinesville, Kentucky. The jury was required to find that the engineer negligently caused the train to move at an excessive rate of speed at the time when deceased was preparing to alight therefrom, and at the time when, under the circumstances and conditions prevailing, the engine and train should have been stopped or its speed so slackened as to afford deceased a reasonably safe opportunity to alight therefrom. A judgment of $45,000 was entered in respondent's favor in accordance with the jury's verdict.

Respondent has filed in this court a motion to dismiss appellant's appeal for the reason that appellant's statement of facts in its brief violates Rule 1.08 (a) and (b) of this court in that appellant has not made a fair and concise statement of facts without argument. This motion was taken with the case. We have examined it and have concluded that while it is not a model statement, it complies sufficiently with our rules; therefore, respondent's motion to dismiss is overruled.

Appellant's first assignment of error is that respondent failed to make a submissible case under pleadings and evidence and, therefore, its motion for a directed verdict should have been sustained.

Deceased was head brakeman of the crew of appellant's train known as "1864 South." The other members of that crew were the engineer Scalf, the fireman Livesay, the conductor Peace and the rear brakeman or flagman Montgomery. This train was being operated from Corbin, Kentucky, to Page, Kentucky.

In ruling upon the question of whether respondent made a submissible case for the jury we must disregard appellant's evidence unless it aids respondent's case, and consider the evidence most favorable to respondent and favorable inferences therefrom. Bootee v. Kansas City Public Service Company, 353 Mo. 716, 183 S. W. (2d) 892. With this rule in mind, we will state the facts most favorable to respondent and omit appellant's evidence, except where it aids respondent.

Pineville, Kentucky, is one of the stations on appellant's line from Corbin to Page. At Pineville the train in question was proceeding in a southward direction and consisted of 61 freight cars and caboose. At this station 50 of the cars next to the engine were to be cut off and placed on the interchange track; then the train was to proceed south to Page. It was deceased's duty to outline the details of the switching movements.

The first track east of the station at Pineville was the southbound main track on which this freight train was being operated. The next track east of the southbound main was the passing track, and east of the passing track was the northbound main track. Between the southbound main track and the passing track was a concrete platform 15 feet wide and a like concrete platform between the passing track and the northbound main track. The passenger station was 165 feet in length and these concrete platforms extended 170 feet north of it and 215 feet south. The passing track extended 530 feet south of these concrete platforms and 300 feet north of them. At the south end of the passing track there was a crossover connecting the southbound main track and the passing track, and nearby the northbound main and the passing track came together. At the north end of the passing track crossover tracks connected it with the southbound main track and the northbound main track. Still further north there was a crossover connecting the northbound main and southbound main tracks, and there was a trestle over Straight Creek north of this connection. North of the trestle was a track running in a northeast direction known as the interchange track. It was upon this track that the 50 cars in this freight train were to be placed.

When the engine got to a point approximately opposite the north end of the passenger station, deceased got up from his seat in the cab of the engine and went to the rear, preparatory to getting off. He passed through curtains at the rear of the cab, and that was the last time the fireman saw him. The engineer saw him after he had passed through these curtains when he was at the top of the steps holding onto the hand rails. He had a fireman's lantern and a red fuzee with which he intended to signal. Due to a slight curve in the track the engineer could not see signals from the rear, so deceased got off, or attempted to get off, the engine on the fireman's, or east, side. When the engine had proceeded two or three lengths south of the south end of the station the engineer told the fireman to look back and see if he could see Ford. The fireman reported that he could not see him and that the train should be stopped, which was done in about two or three car lengths. The fireman went north along the east side of the train almost to the north end of the station, then crossed over to the west side of the train and went further north, but did not see deceased. He then proceeded south, and the train suddenly started forward. He caught on to the first or second car from the engine and when he reached the cab he asked the engineer why he had started. The engineer told him that he had moved over to the fireman's side of the cab and started the train on a signal he got from deceased.

The signal on which the engineer moved the train had, in fact, been given by Montgomery, the rear brakeman. When the train first stopped the caboose was blocking the highway north of Straight Creek and the conductor told Montgomery to signal the engineer to

move ahead. After deceased's disappearance the 50 cars were placed upon the interchange track and the members of the train crew went to look for him. His body was found about 30 feet south of the south end of the passenger station, jammed between the east rail of the southbound main track and the concrete platform. About 25 to 30 feet north of where his body was found there were footprints in the snow and ice on this platform, and skid marks leading from the footprints to the east rail of the southbound main track. From the point where the skid marks ended to the place where the body was found the snow was pushed and shoved up.

The accident happened about 4:30 A. M. and it was very dark. It was snowing and the platform and station grounds were covered with ice and snow.

Montgomery testified that the natural and customary thing for the head brakeman to do was not to ride down south to the clearance point, but to get off in front of the passenger station. He could then observe the lights on the caboose and see that it passed the switchstand on the west side of the main track at the north end of the passing track in order to give clearance at that point, after which he could make the cut off, in this case 11 cars, and leave them in front of the station. Then the conductor could go back from the caboose and throw the switch at the crossover at the north and he, Montgomery, could line up the switches for the interchange track. The head brakeman could then get on the rear of the 50 cars and go south to the switch and there throw this switch which would enable the 50 cars to be backed from the southbound main track onto the passing track.

Montgomery also testified that he had been both a head and rear brakeman; that he had made this run for 23 years and it was his opinion that at this station the train should not have been running more than two miles an hour at the time it reached the place where deceased got off, taking into consideration "the weather such as it was and the ice such as it was, and the snow such as it was, and the prevailing condition there." On this occasion he testified that the train was running from 10 to 12 miles an hour at this place.

Appellant's testimony was to the effect that deceased should have gotten off the ▮▮▮ engine at the south clearance point which was about 400 feet south of the station and that his body was found more than 300 feet from the place where he should have done his first work; and that the engineer did not know that he would get off at the station but expected him to get off at the clearance point. As previously stated, in ruling on the question of appellant's motion for a directed verdict, we must disregard appellant's testimony which conflicts with that of respondent.

▮▮ Appellant contends that the jury's verdict is based upon conjecture and speculation, and upon presumption, and that there is no showing that deceased's death was the direct and proximate

result of its negligence. Appellant cites many cases to support its contention, among which are Brady v. Southern Ry. Co., 320 U. S. 476, 64 S. Ct. 232; C. M. & St. P. Ry. Co. v. Coogan, 271 U. S. 472; Reading Co. v. Boyer, 6 Fed. (2d) 185; Missouri Pac. R. Co. v. Davis, 186 S. W. (2d) 20; Pennsylvania R. R. Co. v. Chamberlain, 288 U. S. 333, 77 L. Ed. 819. These cases are to the effect that under the Federal Employers' Liability Act the injured employe must show that the negligence of the railroad is the direct and proximate cause of the employe's injury, and that such negligence cannot be based upon speculation and conjecture; a mere possibility of negligence is not sufficient for an inference of negligence.

We have no quarrel with the law as pronounced in these cases, but we do believe appellant puts too strict an interpretation upon the evidence of respondent.

We think it is our duty to follow the very recent case of the Supreme Court of the United States of Lavender v. Kurn et al., 90 L. Ed. 692, 1. c. 696-697, wherein that court said:

"It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable."

We think there is an evidentiary basis for reasonable men to find that the engineer knew that deceased was going to get off the engine at the south end of the concrete platform because when he last saw him he "was a-hold of those hand-holds that go down at the end of the tank and the engine." If deceased were not going to get off at that point, why did he leave the warm cab some 400 feet before he was to leave the engine, as contended by appellant? Montgomery testified that the train was going 10 or 12 miles an hour at that point, and that it was not safe under the conditions that then existed at the station and concrete platform to get off unless the train was brought to a stop or was not going more than two miles an hour. If the train was going 10 to 12 miles an hour, the jury had the right to infer that negligent speed caused deceased to slip and slide on the snow and ice under the train. There is evidence that there were foot prints over the east rail of the southbound main track. Under these facts it cannot be said that there is a complete absence of probative facts

to support the conclusion reached by the jury. We think the evidence is sufficient to show that deceased met his death as a direct result of appellant's negligence.

In its brief appellant also contends that its motion for a directed verdict should have been sustained for the reason that the interstate character of work on the occasion in question was not shown, a prerequisite to recovery under the Federal Employers' Liability Act.

The following admission was read into the record:

"By Mr. Chapman: 'All these empty cars originated at a point in Kentucky and were going to a point in Kentucky.'

"By Mr. Eagleton: 'That was to a mining company at Page, Kentucky, where they would then receive loads and start back as 1864, that being the engine number North, and that was a routine part of their duties day in and day out. That on the occasion in question, had no injury to Mr. Ford interfered, they would have received on that occasion loaded cars, some of which were interstate and some of which were intrastate, in their nature, that is to say, some of those were destined within the confines of the State of Kentucky and some others were destined beyond the State limits of Kentucky, and that same thing, that same condition would be, generally speaking, true on the days immediately prior to that particular day.'

"By Mr. Chapman: 'He says—it might and it might not. The routine nature of it was the same.'

"By Mr. Eagleton: 'The routine nature of it was the same, but he wouldn't know how many cars were interstate and he wouldn't know how many cars would be intrastate.'

"By Mr. Chapman: 'I told Mr. Eagleton we would make that admission, and I am living up to it.'"

Section 51 of 45 USCA, page 118, as amended in 1939, reads in part as follows: "Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter."

"It seems to us that the test, 'any part of whose duties shall be in furtherance of interstate commerce,' means to include, at least, any part of such employee's duties on the particular mission or continuous operation to which he is assigned for the particular work period or tour of duty on which he has commenced to serve." Taylor v. Lumaghi Coal Co., 352 Mo. 1212, 181 S. W. (2d) 536, l. c. 538.

As we read the stipulation, it means that if deceased had not been injured they would have received loaded cars on the return trip,

some of which would have been interstate cars and some of which would have been intrastate cars. Under the act, as amended, it is not necessary that any part of the employe's duties be in furtherance of interstate commerce on the very day of his injury. Wright v. New York Central R. Co., 288 N. Y. 719, 43 N. W. (2d) 97. Since deceased would not have completed his tour of duty until the next day when his train would have returned to Corbin, Kentucky, we hold that he came under the Federal Employers' Liability Act, as amended. It follows that the trial court properly denied appellant's motion for a directed verdict.

■ Appellant's next assignment of error is that plaintiff's instruction No. 1 is erroneous. Its first objection to this instruction is to the following language: ". . . and in this connection you are further instructed that said Bert F. Ford did not assume, by reason of his employment, the risk of being injured through such negligence, if any, on the part of said engineer . . .," for the reason that it injected an issue foreign to the issues involved in the instant case, and tended to confuse and mislead the jury.

Assumption of risk was not pleaded by appellant. This issue was not within the purview of the pleadings, but respondent contends that the issue was injected by appellant in the testimony given by the engineer who testified as follows:

"Q. Now, you have told me, I assume, all that was said and done by you or the fireman or Ford at that time; is that right?

A. Well, that is a good outline of it, at least.

Q. As near as you recollect?

A. Yes, sir. Just a question there—when he [deceased] was talking to me and started to turn away to go through these curtains I am talking about, I asked him was that too fast, and he said: 'No.'

■ Q. Asked him what?

A. Was that too fast—in other words, was that too fast for him to get off; and he said: 'No.'

Q. You asked him that and that is what he said?

A. Yes, sir.

Q. That is when he was standing there, you say?

A. That is when he was talking to me over here on the right side of the engine, and he started to go away to prepare to get off. I said: 'Is that too fast, Bert,' and he said: 'No.' "

This testimony was from a deposition of this witness which was taken by respondent but used by appellant. When the above questions and answers were read this issue was thereby injected by appellant.

Section 82 of the Code of Civil Procedure, Laws of Missouri, 1943, page 378, reads in part as follows: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to

cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.''

By introducing this testimony appellant made assumption of risk an issue to be treated as if it had been raised by the pleadings. Copeland v. Terminal R. Assn., 353 Mo. 433, 182 S. W. (2d) 600. This evidence undoubtedly injected into the minds of the jurors the thought that deceased, knowing the speed of the train, voluntarily assumed the risk of injury by reason of attempting to alight from the engine. The above quoted part of the instruction plainly told the jury that assumption of risk was not an issue. Appellant relies upon the case of McCurry v. Thompson, 352 Mo. 1199, 181 S. W. (2d) 529; however, that case was tried before the New Code of Civil Procedure was in effect and, therefore, is not in point. We find no reversible error in the above quoted part of instruction No. 1.

Appellant also complains of another part of this instruction, which reads: ''. . . if you further find and believe from the evidence that it was the duty of said engineer to exercise ordinary care . . .'' Appellant contends that this part of the instruction submitted a question of law to the jury and is, therefore, erroneous.

Appellant did not specifically make this objection to this instruction when it made its objections prior to the court's giving them. In paragraph 9 of its objections to this instruction an objection in general terms only was made, but the error now assigned was not made at that time. Under our rules this is not sufficient to preserve the point now urged for our review.

In this instruction, which was a long one, a verdict for plaintiff was authorized only upon a finding that the engineer failed to exercise care to afford deceased a reasonably safe opportunity to alight from the engine. This could not have been prejudicial. Under the record, this assignment of error is overruled.

Appellant assigns as error the court's overruling its objection made during the argument of respondent's attorney in reference to the assumption of risk. We have already ruled that under the record the reference in the instruction to assumption of risk was proper; it necessarily follows that to argue this point was not error.

Appellant's fourth assignment of error is that the court erred in permitting Montgomery to state his conclusions as to what happened, judging by the footmarks in the snow, and as to what was a safe and an unsafe speed for the operation of the train at the time deceased alighted from the engine, as this testimony invaded the province of the jury.

The record shows that Montgomery had been working for appellant as both a rear brakeman and head brakeman, and had ridden over this run for about 23 years. We think these matters were proper

subjects for expert testimony. Crecelius, Admx. v. Chicago, Milwaukee & St. Paul Railway Co., 284 Mo. 26, 223 S. W. 413; Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950.

Appellant's last assignment of error is that the verdict and judgment is excessive. The evidence shows that deceased was 51 years of age at the time of his death. His widow was the same age. For two years prior to his death he had earned an average of $1,857.32 as respondent's employe, and had increased this amount by acting as a salesman for a Bible house. In fact, the evidence shows that he had contributed $200 a month to the support of his family, which consisted of his widow and seven minor children; it also shows that he instructed his children in their school work and religion.

It is only where the trial court has abused its discretion in ordering a remittitur, or in failing to order a remittitur, or in the amount ordered, that a judgment is reviewable by this court. Dodd v. Missouri-Kansas-Texas R. Co., 354 Mo. 1205, 193 S. W. (2d) 905.

"The question of excessive damages is always a vexing one. A frequently invoked rule, when a question of excessive damages is for disposition, is what is termed the rule of uniformity. That rule may be stated as follows: When the facts in other cases are similar to the facts in hand, there should be a reasonable uniformity as to the amount of damages. See Mickel v. Thompson, Mo. Sup., 156 S. W. 2d 721, loc. cit. 728, and cases there cited.

"In the present case, deceased, at time of his death, was 38 years old; his expectancy was 29.62 years. He left, surviving, his widow, then 34, and two sons, 2 and 9½ years old. The average monthly earnings of the deceased, for the 3 years immediately before his death, were $167.16.

"Hancock v. Kansas City Terminal R. Co., Mo. Sup., 146 S. W. 2d 627, was under the Federal Employers' Liability Act for damages for the death of the plaintiff's husband who was foreman of a switching crew. Hancock was 38 years old, and his expectancy was 29.62 years, same as Finley, the deceased in the present case. Hancock's widow was 32, and plaintiff, in the present case, was 34. Hancock left one son, age 11, and as appears, supra, Finley left two sons, 2 and 9½ years old. Hancock's average monthly earnings for the two years immediately prior to his death were $180.31, and Finley's average monthly earnings for the three years immediately prior to his death were $167.16. A remittitur of $6,000 was required in the Hancock case, which reduced the judgment to $25,000.

"In the Hancock case, 146 S. W. 2d loc. cit. 630, it is said: 'We know of only two death cases in this state, under the Federal Employers' Liability Act, in which judgments have been affirmed for $30,000, without any element of conscious pain and suffering. [There was no evidence of such in the present case.] These cases are Moran

v. Atchison, T. & S. F. R. Co., 330 Mo. 278, 48 S. W. 2d 881; and Truesdale v. Wheelock, 335 Mo. 924, 74 S. W. 2d 585; see comments on these cases by Court en Banc in Sheehan v. Terminal R. Assn., 344 Mo. 586, 127 S. W. 2d 657. In the Truesdale case the man killed was younger and left more dependents than in this case. He also had greater earnings. In the Moran case (which was a four to three decision in Banc, and while the dissent was not on damages, it would have allowed a new trial), the man killed was also younger and he left younger dependents. The majority opinion commented on the fact that defendant asked no instruction on the measure of damages, as one reason for sustaining the verdict. In Stottle v. Chicago R. I. & P. R. Co., 321 Mo. 1190, 18 S. W. 2d 433, a $28,000 judgment was affirmed for death of a man with earnings the same as in this case. He was much younger than Hancock and also left younger dependents. In Kidd v. Chicago, R. I. & P. R. Co., 310 Mo. 1, 274 S. W. 1079, a verdict for $30,000 was held excessive and a $5,000 remittitur required. There also the man was younger than here with somewhat larger earnings) and left more and younger children dependent upon him. Other cases, in which $25,000 verdicts were approved, are cited in the Truesdale case.'' Finley v. St. Louis-San Francisco Ry. Co., 349 Mo. 330, 160 S. W. (2d) 735, l. c. 739-740.

There was no conscious pain and suffering in this case; however, when we consider the changing economic conditions (see Petty v. Kansas City Public Service Co., 354 Mo. 823, 191 S. W. (2d) 653; and Young v. Terminal R. R. Assn., 192 S. W. (2d) 402) we believe the rule of uniformity will be observed if the judgment is reduced to $30,000.

It is, therefore, ordered that if respondent will, within ten days, enter a remittitur of $15,000 as of date of judgment, then the judgment will be affirmed for $30,000 as of its date; otherwise, the judgment will be reversed and the cause remanded. It is so ordered. All concur.