259 S.W.2d 132 (1953)
BRAY
v.
ST. LOUIS-SAN FRANCISCO RY. CO. et al.
No. 7088.
Springfield Court of Appeals. Missouri.
February 4, 1953.
*134 E. G. Nahler, St. Louis, Ward & Reeves, Caruthersville, for appellants.
Riddle & Baker, Malden, Tom R. R. Ely, St. Louis, for respondent.
McDOWELL, Judge.
This is an action for personal injuries and property damage resulting from collision between plaintiff's automobile and defendant's train. The cause was tried in the Circuit Court of Dunklin County, Missouri, before a jury, resulting in a verdict and judgment for plaintiff in the sum of $3,000 for personal injuries and $865 damages to the automobile. Defendants appealed.
This is the second appeal to this court. The cause was first tried on October 21, 1949, resulting in a verdict for plaintiff in the sum of $5,000. The trial court sustained a motion for a new trial and the judgment of the trial court was sustained by this court on appeal. This action was reported in 236 S.W.2d 758.
The pleadings are unchanged. The petition alleged both primary and humanitarian negligence and the answer denied liability, pleaded contributory negligence and a counterclaim for damages to the locomotive of defendant railroad. Plaintiff's action was against both the railroad and the engineer.
The cause was submitted to the jury on humanitarian negligence only.
We will refer to respondent in this opinion as plaintiff and to the appellants as defendants, being the positions they occupied in the lower court.
The evidence shows that the collision occurred March 5, 1948, at about 4:20 P. M., in Dunklin County, Missouri, where highway No. 53 crosses defendant's railroad tracks. At the time of the collision plaintiff was driving his 1939 Dodge automobile from Campbell to Kennett, Missouri, going in a southeasterly direction on highway No. 53, which is a 20 or 22 foot asphalt blacktop road. In describing the accident plaintiff gave this answer: "A. Well, I was on my way to Kennett and when I come into Gibson I passed that railroad sign and I looked both ways to see if the train was coming and I didn't see any and I started across the crossing and when I was about sixty feet of the crossing I was the Moose on the curve."
Plaintiff testified that this was a new road but that he had been over the crossing two or three times before. Plaintiff gave this testimony:
"Q. Will you tell the jury at about what rate of speed you were travelling? A. I was travelling about sixty or sixty five miles an hour I believe, when I first saw the Moose and it was about sixty feet away from the track at that timeI believe I was doing sixty five.
"Q. Do you remember if you had any windows on your car door? A. The two front ventilators.
"Q. Now after you got within a quarter of a mile of the railroad crossing will ask *135 if the train gave any signal or whistle or any warning? A. Definitely not.
"Q. If it had sounded its bell or whistle could you have heard it? A. Definitely I could.
"Q. Do you recall at about what spot you collided with the Moose with reference to the front end of it? A. I judge it would be ten or fifteen feet, * * *, from the front end."
The witness testified that he applied the brakes when he saw the train; it was just making the turn and that that was the last he remembered; that he turned to the right to go the same way the Moose was going; that there was no warning given and the train did not seem to slow down any.
On cross-examination plaintiff testified:
"Q. Tell the jury if you slackened your speed any? A. I believe I was going almost thirty miles an hour when I hit the train."
He stated that after passing the sign he cut down his speed about 5 miles an hour but did not apply brakes until 60 or 65 feet from the crossing. He gave this testimony:
"Q. You saw that highway sign, you say? A. Yes, sirthat is right.
"Q. How far is that from the crossing? A. I would say just about three hundred feet.
"Q. How fast was the Moose travelling? A. I don't know exactly, but I would say thirty miles an hour.
"Q. He was travelling about half as fast as you were? A. I would believe so."
He testified that when he was about 65 feet from the crossing the Moose was about 30 feet. He testified:
"Q. Were you on the paved part of the highway at the time you hit the Moose? A. I was right there on the pavement.
"Q. Was you as far on the west side of the pavement as you could have gotten? A. I believe that would be the west or southwest side and I was over there as far as I could get."
He gave this answer: "A. I figure I hit the Moose fifteen feet from the front end."
"Q. And you hit it on the southwest edge of the paved part of this highway? A. Yes, sir.
"Q. How wide is that pavement there? A. I would judge twenty feet, but I didn't measure it.
"Q. Then how far is it from the east edge of the pavementhow far is it from the east line of the pavement over to the right of way fence? A. I would say about seventy feet.
"Q. The front end of the motor car was in plain view a distance of seventy feet on the east side of the pavementI mean ninety feet to the east? A. Well, it would be if that was the distance there.
"Q. Now if it were ninety feet away and you were travelling twice as fast you would be one hundred eighty feet back when it come out over the right of way line? A. I probably would be."
The witness testified that as he approached the crossing from the north there were bushes along the right-of-way fence and vines 6 or 7 feet high and that there were trees and bushes along the railroad right-of-way, all of which prevented him from seeing the train. He stated that when the train reached a point about 35 feet from the east line of the highway it makes a 90 degree turn and that it was about 35 feet from the highway line to where the bushes set in along the fence line. He gave this testimony:
"Q. And plus the ninety feet you named awhile ago it would give you a hundred and twenty five feet? A. I believe it would."
He stated that the highway was a little elevated there and the railroad tracks were also elevated a little; that the fence was 4½ feet high and the vines thereon 6 or 7 feet high. He gave this testimony:
"Q. You saw the highway sign three hundred feet away? A. That is right.
"Q. You knew you were coming to a railroad crossing? A. Sure I knew that.
"Q. And you looked for it? A. Yes, sir.
*136 "Q. And you didn't see it until you was within sixty or sixty five feet from the crossing? A. That is correct.
"Q. Where was the front end of the Moose when you first saw it? A. Coming out from behind the trees just when it made the curve from behind those bushes.
"Q. You first saw it when it stuck its nose out on the highway right of way? A. Yes, sirthat is correct.
"Q. And that was about thirty five feet from where you hit it? A. That is correct."
J. L. Petty, of the State Highway Patrol, testified he investigated the accident March 5, 1948; that he arrived there about 5:00 P.M.; that the parties were not present. He stated that the railroad crosses the highway at right angles; that it was wintertime and everything was dead and that he was sure that one could see the Moose if he had looked: that the railroad track travels almost west until it reaches about two or three hundred yards from the crossing and that there is visibility quite some distance on highway No. 53. He testified:
"Q. After the Moose turned the curve your opinion is that you could see it? A. Yes, sir."
He stated the roads were dry at the time; that he saw skid marks for about 60 feet where Bray's car had skidded from the railroad track. He stated that the car traveling at 60 miles an hour could be stopped in about 225 feet. He testified that there were no obstructions along the highway as it approached the crossing or on the railroad right-of-way which would have prevented plaintiff from seeing defendant's train, had he looked.
Plaintiff's evidence was corroborated by other testimony as to growth along the railroad tracks and as to growth along the east fence line of the highway. There was conflicting testimony as to whether or not warning signs were given, either by sounding the whistle or ringing of the bell as the train approached the crossing. While most of plaintiff's testimony is negative, that is, plaintiff's witnesses testified they didn't hear any warning sound and the testimony on the part of defendant was that the whistle was sounding and the bell ringing continuously as the train came into the crossing.
C. O. Slaughter, engineer on defendant's train, testified, in behalf of plaintiff, that the accident happened about 4:20 P.M.; that the locomotive was a gasoline engine, the front of the engine being black and white striped; that the train consisted of the motor and one coach. The motor car was a combination of motor, mail and baggage. He gave this testimony:
"Q. Just where did that occure? A. Well, it is a new highway 53 that runs in a southward direction between Campbell and Holcomb.
"Q. At what angle does the highway 53 cross the Railroad tracks? A. Well, it is about the center of a long curve, the railroad curves to the left going south and the road, I would say, goes in a southernly direction.
"Q. More south than east? A. Yes.
"Q. The railroad runs genneraly south there. A. Yes. Before it reaches the curve there I would say it was running almost in a westerly direction, but in the curve it curves to the south.
"Q. Was there any obstruction to obscur the view of any driver coming southeast on this highway? A. No, there was nothing."
He testified that the whistle board was about a quarter of a mile east of the railroad crossing and that when he passed the whistle board his speed was between 35 and 38 miles an hour; that after he passed this board, he shut his motor off and drifted on around. He stated it was about 500 feet from the crossing when he shut off the motor; that he did not apply his brakes until he saw this automobile approaching. He gave this testimony:
"Q. Where were you when you saw this automobile? A. Well, I was six or 700 feet east of the highway.
"Q. Six or seven Hundred feet from the intersection? A. From the intersection, yes.
"Q. Was that the first time you saw the automobile? A. No. I saw the automobile when he was approximately 1800 feet from the crossing. I saw there was traffic, *137 of course, I watched him all the way around the curve there.
"Q. Could you estimate how fast he was going when you first saw him? A. I judge he was going around 50 or 55 miles per hour. * * *
"Q. Where were you? A. I was around 1,000 feetbetween 800 and 1,000 feet when I saw the automobile coming."
The witness testified that he shut his engine off about 600 feet from the crossing and was going to just drift around to the station stop. He stated plaintiff was getting closer to the crossing all the time and that he was watching him. He gave this testimony:
"Q. He had slacken his speed, as far as you observed? A. No, not to the best of my oberservation he hadn't.
"Q. From this 600 foot point did tou keep observing the car? A. I did. I watched the car right on around.
"Q. Did he slacken his speed any after this 600 foot point? A. He didn't slacken his speed that I could tell until he was around 70 or 80 feet from the crossing.
"Q. And you had your eyes on him during that time? A. Yes. I was watching him.
"Q. When did you first apply your brakes? A. Well, I made a little application of the brake around, oh, 300 feet, I guess, from the intersection.
"Q. So that you were going about how fast at that 300 foot point? A. Around 30 to 32 miles an hour.
"Q. After that 300 foot point did you apply your brakes again? A. Not until I saw that he hadn't slacken his speed.
"Q. Where were you then? A. Well, I judge I was about 40 to 60 feet.
"Q. From the crossing? A. From the intersection."
The witness testified that plaintiff, from 1800 feet back, did not slacken his speed until he was within 70 or 80 feet of the crossing. He stated that from approximately 500 feet from the crossing he continued to blow the whistle; that plaintiff's car was coming at a high rate of speed and he was trying to warn him. He gave this testimony:
"Q. You blew the whistle from the whistle board clear up to the crossing?
A. Almost continually."
He stated he applied his brakes when he saw there was going to be a collision; that he applied his brakes in emergency. He gave this answer: "A. I judge I was 40 to 50 feet from the crossing."
"Q. Do you know how fast you were going when your engine was crossing this intersection? A. I was making between 20 and 24 when I was crossing the crossing."
He testified that the crossing is about 1000 feet from the stop at Gibson; that when he was within 40 or 50 feet of the crossing plaintiff was from 70 to 100 feet. He gave this answer: "A. The front bumper struck the step of the motor car that goes up in my cab. The step is about five feet and seven or eight inches from the front of the motor car, and about seven feet back from the front end * * *". He stated that the back end of the car swung around and hit the train and then rolled back on the highway off into the ditch and turned over on its side; that it rolled approximately 8 feet north of the crossing and then turned over. He testified that as he approached the crossing the bell was ringing before the accident and had been since before he reached the whistle board; that it was an automatic bell ringer. This witness testified there was nothing to prevent the automobile driver from seeing the train, had he looked. He stated there was a railroad crossing sign, a cross-arm, put there at the crossing.
Defendant's testimony was to the effect that the bell was ringing and the whistle blowing as the train approached the crossing and that witnesses on the train felt the shock when the brakes were applied before the crash. This testimony was in direct conflict with plaintiff's testimony on these points.
We think this is all the testimony that is necessary for the decision of the issues in this case.
The only issue submitted to the jury in the case was whether or not defendants were guilty of humanitarian negligence *138 by failing to give a warning to the plaintiff and thereby have prevented the collision.
Defendants' first assignment of error complains of the action of the trial court in refusing to sustain a motion for a directed verdict offered at the close of the whole case.
Under this assignment of error defendants complain that the decision of this court in the former appeal affirming the judgment of the trial court and holding that plaintiff failed to make a prima facie case under the humanitarian rule is the law of the case and is binding upon this court. Defendants contend that the evidence before the court now is the same substantially as it was in the former trial.
In Creason v. Harding, 344 Mo. 452, 126 S.W.2d 1179, 1183, the law is stated:
"`"The law of the case" applies where a general principle of law is declared as applicable to the facts of the case. If it is remanded generally all issues are open to consideration on a new trial. The pleadings may be amended or new and controlling facts produced. Often a second appeal presents a totally different case from that appearing on the first appeal. In all cases of general reversal, whether different issues and different evidence appears in the second trial or not, this court, upon a second appeal, if convinced that it has, on the first appeal, announced a rule of law out of harmony with our former rulings or has been mistaken as to some controlling fact (not in the weight of the evidence), may overrule its pronouncement in the former appeal. * * * A statement of the law as applied to the facts in the cause is one thing and a determination of the issues tendered in the cause is another thing. Where a case is reversed and remanded with specific directions to try certain issues only, all other issues are determined on the first appeal. In general reversal and remand the court states a rule for further proceeding on the issues joined. Where the reversal is with specific directions as to certain issues, other issues determined are foreclosed to further inquiry. The first states "the law of the case"; the second is res adjudicata final.' ([Denny v. Guyton] 331 Mo. 1115, 57 S.W.2d [415] 419.)"
Lonnecker v. Borris, Mo.Sup., 245 S.W.2d 53, 55, cited by defendants, states the law thus:
"* * * The adjudication of that appeal and the questions presented constitute the law of this case and of this appeal unless the former ruling was palpably wrong or unless there is a substantial difference in the evidence and the facts upon the two trials. * *"
In the former appeal of this case the trial court had sustained a motion for new trial because of the insufficiency of the evidence to support the verdict. We sustained that finding, holding that the trial court has a wide discretion in passing upon the motions for new trial. We also held that the evidence was such that the trial court was justified in finding that the plaintiff had failed to make a case. If the evidence and the issues in this case were the same, we would be bound by the law as determined in the former appeal. However, we cannot agree with defendants' contention herein that the evidence in the second trial is the same. There were two additional witnesses and the testimony of the plaintiff as to the reasons why he failed to discover the approaching train is considerably different. Under the evidence in the case at bar he offered evidence that there were obstructions, both on the road right-of-way and upon the railroad right-of-way, which prevented him from seeing the approaching train. Plaintiff testified that he looked both ways and, because of these obstructions, could not see the approaching train. This was supported more forceably in this trial by testimony from witnesses who were on the train. There was also testimony in this case that plaintiff could not have stopped his car in less than 240 or 245 feet by one witness and 225 feet by another witness. The testimony on the former trial was silent as to the distance required to stop a car at the speed plaintiff was traveling at the time of the collision. Therefore, we hold that it is our duty to consider the whole record in this case to determine the sufficiency *139 of the evidence to support the verdict.
Whenever facts are in dispute or evidence is such that fair-minded men may draw different inferences, the question is one for the jury. Only where there is a complete absence of probative facts to support the conclusion reached by the jury do we have reversible error. If there is evidentiary basis for the jury's verdict the judgment must stand. The appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable. Ford v. Louisville & N. R. Co., 355 Mo. 362, 196 S.W.2d 163.
This case also holds that, where the sufficiency of the evidence is considered, plaintiff's evidence is taken as true, together with all reasonable inferences that can be drawn therefrom and any evidence offered by defendants that supports plaintiff's case. Young v. Wheelock, 333 Mo. 992, 64 S.W.2d 950.
In Hillhouse v. Thompson, 362 Mo. 700, 243 S.W.2d 531, it is held that the court will not weigh the evidence on defendant's motion for a directed verdict but will submit the case to jury if the evidence adduced in support of plaintiff's case is substantial when coupled with inferences legitimately deducible therefrom.
In Knorp v. Thompson, 352 Mo. 44, 175 S.W.2d 889, 899, the law as to humanitarian doctrine is stated:
"The constitutive facts of a humanitarian case are: `"(1) Plaintiff was in a position of peril; (2) defendant had notice thereof (if it was the duty of defendant to have been on the lookout, constructive notice suffices); (3) defendant after receiving such notice had the present ability, with the means at hand, to have averted the impending injury * * *; and (5) by reason thereof plaintiff was injured." Evidence tending to prove these facts makes a prima facie case for plaintiff. In some instances obliviousness of danger on the part of the plaintiff is necessary to make the situation in which he is placed one of peril. In such cases it is of course incumbent upon the plaintiff to make proof of the facts and circumstances tending to show obliviousness, not only for the purpose of establishing that he was in a position of peril, but to bring home to defendant a knowledge of his peril. In these cases, however, obliviousness is but a subsidiary or evidentiary fact, the perilous situation of plaintiff and defendant's knowledge of it are the ultimate, issuable facts.' Banks v. Morris & Company, 302 Mo. 254, 257 S.W. 482, 484."
There can be no question here that the defendant had a duty to maintain a lookout for persons approaching the intersection of a public highway and defendants' tracks. Womack v. Missouri Pac. R. Co., 337 Mo. 1160, 88 S.W.2d 368.
In Womack v. Missouri Pac. R. Co., supra, it is held that obliviousness is an essential element for a humanitarian negligence case based upon a failure to warn, since, if plaintiff knew of the train's approach, there would have been no duty to warn him and a warning would serve no useful purpose. Pentecost v. St. Louis Merchants' Bridge Terminal R. R. Co., 334 Mo. 572, 66 S.W.2d 533, 535.
In Harrington v. Thompson, Mo.Sup., 243 S.W.2d 519, 523, the court states the law thus:
"It is true, as contended by defendant, and as established by the cases it cites, that no duty existed as to plaintiff until he was in a position of imminent peril; that when he was in a position of peril is a question for the jury under all the evidence; that no duty arises as to an oblivious plaintiff until it reasonably appears or should reasonably appear that plaintiff is oblivious and intends to proceed into the path of a moving vehicle, and that the evidence must be such that the jury could reasonably find that there was time after plaintiff was in a position of imminent peril and after defendant knew or should have known of it for an effective warning to have been given."
We think this law fully covers the case at bar. In other words, in the case at bar *140 there was a duty placed upon the defendants to keep a lookout for plaintiff's car and other cars approaching the railroad crossing in question, therefore, if defendants, by the use of ordinary care, discovered, or could have discovered, plaintiff in a position of imminent peril and oblivious to his danger and that there was time after such knowledge, either actual or constructive, for an effective warning which would have prevented the injury, then defendants are liable under the humanitarian doctrine. Was there substantial evidence from which the jury could reasonably find that after the engineer on defendant's train saw, or should have seen, plaintiff in a position of peril, he had the present ability, with the means at hand, to have averted the impending injury? Young v. St. Louis Public Service Co., Mo.Sup., 250 S.W.2d 689, 692.
First, we hold that defendants were under no obligation to sound a warning to plaintiff until plaintiff reached a position of imminent peril, therefore, the testimony as to what occurred a quarter of a mile back from where the collision occurred has no bearing upon this case. The testimony is undisputed that plaintiff had knowledge of the railroad crossing. Plaintiff testified that he saw the railroad warning sign on the highway 300 feet before he reached the tracks. He testified that he looked both ways for the train but saw none. He said that there was a high fence row along the highway right-of-way and trees and bushes along the railroad right-of-way, which obscured his view so that he could not see the train; that the train gave no warning and that he did not see it until he was within 60 or 65 feet from the tracks.
On cross-examination he says that the right-of-way from the pavement to the east edge thereof was 70 feet. The physical facts as shown by the skid marks on the pavement, left by plaintiff's car show that these marks were 60 feet from the tracks north on the highway. The court will take judicial notice that there is a reaction time of possibly a half a second, therefore, if plaintiff was traveling 60 miles an hour, his car was going 88 feet per second and would travel approximately 44 feet before the brake would take effect and the physical facts show that plaintiff must have discovered the train approximately 100 feet before he reached the crossing. One of plaintiff's witnesses testified that plaintiff's car, traveling at a rate of 88 feet per second or 60 miles per hour, would require a distance of 225 feet to stop. Another of plaintiff's witnesses testified that it would require 240 to 245 feet for plaintiff to stop his car if traveling at a rate of 65 miles per hour which would be approximately the same testimony as given by the other witness based on a speed of 60 miles per hour. This testimony would show the danger zone or the point of peril to be somewhere about 225 to 250 feet from the railroad crossing.
Clearly, no duty existed on the part of defendant to give any kind of warning until plaintiff was in a position of imminent peril and after defendants knew or should have known, by the exercise of ordinary care, of such imminent peril and there must have been sufficient time, after the discovery of imminent peril on the part of defendants, to give an effective warning, that is, to have been able with the means at hand to have warned plaintiff in time to have averted the collision.
Our courts have held that if the facts are such as to disclose the obliviousness of plaintiff as to his danger the being oblivious to such danger might extend to the point of imminent peril.
A person is "oblivious" of a thing when it is extinguished from his mind. Vol. 29, Words and Phrases, p. 67.
Plaintiff testified that he knew of this railroad crossing prior to this collision; that at the time in question he observed the railroad warning sign 300 feet before he reached the crossing and that he slowed his car down some 5 miles per hour at this warning sign. He testified that he looked both ways for defendants' train but was prevented from seeing the same because of obstructions or growth along the right-of-way of the public road and along the right-of-way of the railroad. He stated he did not see the train until he was within 60 or 65 feet of the crossing and until the train was sticking its nose out into the highway right-of-way and that the reason for not having seen the train was the obstructions *141 mentioned and the fact that the defendants failed to give any warning, either by whistling or by ringing the bell. He stated that if such warnings had been given he could have heard the same. Even though plaintiff did know of the railroad crossing and did know that there might be a train coming, yet he could have been oblivious to the immediate danger of the approaching train. Strother v. Dunham, Mo.App., 193 S.W. 882, 884.
But undoubtedly there was nothing in the demeanor of plaintiff, from his own testimony, that would give notice to defendant-engineer that plaintiff was oblivious except the one and only fact that he failed to check his speed and at the time was approaching the railroad crossing at a speed of 60 miles per hour. In other words, from plaintiff's own testimony, he was paying attention to the dangers of this railroad crossing and was looking for the train but was prevented from seeing the same by obstruction.
There certainly wasn't any testimony in this case that obliviousness on the part of plaintiff extended the zone of danger or imminent peril. Defendant's engineer, Slaughter, testified that he was watching plaintiff's car approach the railroad crossing and that he gave warning, both by sounding of the whistle and the ringing of the bell, from some 500 feet back before the reaching of the crossing because he observed that plaintiff was approaching the crossing and not reducing his speed and that, in his judgment, plaintiff did not reduce his speed until he was within 70 or 80 feet from the crossing. Therefore, there can be no question that defendants should have discovered the peril of plaintiff long before he slackened his speed for, from plaintiff's testimony, the danger zone was at least 225 to 250 feet back. This testimony, coupled with plaintiff's testimony, that there were obstructions which prevented him from seeing the train at the point of danger and plaintiff's testimony that no warnings were given, constituted substantial evidence from which the jury could reasonably find that after the engineer on defendant's train saw or should have seen, plaintiff in a position of peril, he had the present ability, with the means at hand, to have averted the impending injury by sounding a warning. Defendants' motion for a directed verdict was properly overruled.
We have examined the cases cited by defendants and find that they are not in point but the law is as we have above stated.
Defendants' assignment of error No. II complains that defendants' instruction No. D-F withdrew from the consideration of the jury negligence of the defendants under the humanitarian rule, and the court erred in refusing it.
With this assignment of error we cannot agree. We held under assignment of error No. I that there was substantial evidence to support the verdict of the jury finding defendants guilty of humanitarian negligence.
Assignment of error No. III, complaining of defendants' instruction No. 1-D, to the effect that plaintiff drove his automobile into the side of the train, if the jury so found, plaintiff could not recover. There was not sufficient evidence to support this instruction.
Assignment of error No. IV complains of plaintiff's main instruction No. 1.
We hold there is no merit in this contention. The instruction merely tells the jury that contributory negligence is not a defense or that negligence of plaintiff which only contributed to or concurred in his injury does not defeat his recovery. Smithers v. Barker, 341 Mo. 1017, 111 S.W. 2d 47, 53.
Defendants offered no sole cause instruction.
Judgment affirmed.
VANDEVENTER, P. J., concurs.
BLAIR, J., not sitting.