ELMINA HOLDMAN, Respondent, v. FRANK A. THOMPSON, Trustee for ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellant.—No. 40941.—216 S. W. (2d) 72.

Division Two, December 13, 1948.

Motion for Rehearing or to Transfer to Banc Overruled, January 7, 1949.

M. G. Roberts, Frank C. Mann, C. Wallace Walter and Mann & Mann for appellant.

*Claude T. Wood* and *Bradshaw & Fields* for respondent.

[72] WESTHUES, C.—Plaintiff in this case brought this suit on her own behalf and on behalf of her two minor children to recover compensatory damages from the defendant railway company for the death of her husband. She obtained a verdict in the sum of $15,000 and from the judgment entered defendant appealed.

Harold L. Holdman, the deceased, on the morning of May 27, 1946, was driving a Ford pickup truck intending to go from his home to a turkey hatchery. On his way he was required to cross the defendant's tracks, at grade, at a point referred to in the evidence as the Dublin Crossing in Pulaski County, Missouri. A passenger train, due at that time, was traveling in a northeasterly direction from Springfield to St. Louis, Missouri. The train struck the truck at the crossing and carried it [73] for a distance of about twelve hundred feet. Holdman was in the truck and was killed by the impact.

Defendant urges that plaintiff failed to introduce any evidence to sustain the charge of negligence on failure to warn, or failure to slacken the speed of the train. The case was submitted to the jury on these two issues. The tracks of the defendant company, at the point of collision, run in a northeasterly and southwesterly direction. A farm-to-market road, known as route 133, located north of the tracks, parallels them for some distance. As stated above, the train was traveling in a northeasterly direction and deceased was driving on route 133, also in a northeasterly direction. Route 133 does not cross the tracks, but there is a county public road, known as the Swedeborg Road, which branches off of route 133 in a southerly direction and crosses defendant's tracks. This is what is called the Dublin Crossing, where the collision occurred. The distance from route 133 to the tracks is ninety feet. The evidence most favorable to plaintiff, given by the fireman of the train, is that the deceased was traveling at about twenty-five miles per hour as he turned off of route 133 onto the Swedeborg Road toward the tracks; that when he reached the tracks he was traveling about fifteen miles per hour. The passenger train, consisting of an engine and fourteen cars, was traveling at a speed of about fifty miles per hour. What the fireman did when he saw the deceased make the turn towards the tracks may be best stated by quoting from his evidence as follows:

"Q. How far were you from the crossing when you saw this truck? A. Well, I would say—oh, three pole lengths—four—something like that.

"Q. Could you put that in feet for us? A. Well, it would be about five hundred feet. I believe those poles are a hundred and thirty-five feet.

"Q. You were about five hundred feet from the crossing at that time? A. I believe so.

"Q. And you say he was about eighty-five or ninety feet from the track when you saw him turn in? A. Something like that.

"Q. State whether or not you did know at the time you first saw him, or saw this truck, that he was going to proceed across the railroad track. A. Well, he was going that way, and you would take it for granted he was, I suppose.

"Q. Could you estimate about how fast he was traveling? A. Oh, I would say, just a guess, twenty-five, maybe thirty miles.

"Q. Twenty-five to thirty miles per hour? A. Yes.

"Q. Did you call the engineer's attention to the truck as soon as you saw it? A. Yes, sir.

"Q. How fast was the train traveling at that time? A. Oh, approximately fifty miles an hour, I judge.

"Q. Well, what were you doing when you first saw the truck? A. Well, I hollered at the engineer to stop and went to sounding the stock alarm whistle on my side.

"Q. How is that whistle operated? A. It is an air-operated whistle.

"Q. How far were you from the crossing when you first sounded that whistle? A. Oh, approximately two pole lengths from there—probably close to three hundred feet.

"Q. That is, you went about two hundred feet before you sounded the whistle, after you saw it? A. Well, no—probably wasn't that far really. When I saw the truck—caught him first, see, would be on the highway, and when I seen it turn in and getting far enough over then is when I hollered at the engineer—leaving the highway, see.

"Q. Did you holler at the engineer when you first saw him start to leave the highway? A. Well, there is a question I couldn't hardly answer, this last, if I get your meaning. Did you mean as quick as I saw this man turn off the farm-to-market road?

"Q. Yes. A. Yes—I did.

"Q. That is when you sounded the whistle? A. That is when I started this—[74] I hollered at the engineer, then started to sound the whistle."

"Q. Now, Mr. Stroud, did you watch this truck after it proceeded from the state highway up toward the railroad track? A. Yes, sir.

"Q. Did it slow up any? A. Well, it had—apparently had slowed up some.

"Q. Well, did you watch it as it reached the crossing? A. Yes, sir.

"Q. How fast was it going at the time it reached the track? A. Oh, I would say fifteen miles an hour probably.

"Q. Did it stop before it went on the crossing? A. No, sir, it did not."

It was further shown by the evidence that from the point on route 133 to the crossing there was an upgrade, the tracks being about nine feet higher than the surface of route 133. The engine struck the truck about center and the truck was on the front end of the engine when the train came to a standstill. There was no dispute with reference to the visibility. The fireman was in a position to see and did see the deceased's truck. The deceased could have seen the train had he looked at any time after he made the turn toward the tracks and for some time prior thereto. The engineer was in no position to see the truck. We are not concerned on this appeal with primary or contributory negligence. The trial court held the deceased was guilty of contributory negligence as a matter of law and that issue was not submitted to the jury.

We will dispose of defendant's contention that there was no evidence on either theory submitted to the jury. We find substantial evidence in the record that no warning was given. There was also substantial evidence that a warning was given. One witness for plaintiff testified that he was driving a car on a public road leading toward the defendant's tracks near the Dublin Crossing; that the train in question passed by in front of him and he heard no bell ringing or whistle blowing at or near the crossing. Two men employed by the defendant, also witnesses for plaintiff, who were working on the tracks about a mile south of the crossing on the morning of the occurrence, testified that the train passed them and gave no warning, either by ringing a bell or blowing a whistle, from that point to the Dublin Crossing. Defendant offered a number of witnesses who testified that the bell was ringing constantly as the train approached the crossing and that warnings were also given by blowing the whistle. It is evident that plaintiff made a case for a jury on failure to warn.

Defendant insists that plaintiff did not introduce evidence to sustain the charge of negligence on failure to slacken the speed of the train. It is further contended that since plaintiff's instruction submitted the two charges of negligence in the disjunctive the instruction was erroneous and therefore the judgment cannot stand. Plaintiff insists the evidence was sufficient on failure to slacken the speed of the train. Plaintiff also raises the question of whether the defendant preserved the point for review. Plaintiff says that the defendant

made no objection, general or specific, to plaintiff's instructions and therefore is in no position to complain. Defendant says no objections were made and that under the provisions of Sec. 122 of our code, as amended by the legislature, Laws 1947, page 227, it is not necessary to make objections to instructions before they are given. The section as amended reads as follows:

"Section 122. Exceptions to rulings or orders of the court.— Formal exceptions to rulings or orders of the court are unnecessary; but for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor *except it shall not be necessary to state grounds for objections for instructions;* and, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice him."

We have italicized the portion of the amendment with which we are concerned. In construing the amendment to the code [75] we must keep in mind the purpose to be accomplished. Prior to the adoption of the new civil code, Laws 1943, pages 353 to 397, it was necessary to make objections to the giving of instructions and to except to the ruling of the court if adverse. Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950, l. c. 956 (17-19); 4 C. J. S. 608, Sec. 306. The new code, particularly Sec. 122 thereof, Laws 1943, page 389, as interpreted by the courts of this state, required objections to be made to the instructions and a statement of the grounds upon which the objections were based. Bulkley v. Thompson, 211 S. W. (2d) 83, l. c. 90 (10); Oganaso v. Mellow, 356 Mo. 228, l. c. 231 (2), 201 S. W. (2d) 365. Sec. 122 did dispense with the necessity of excepting to adverse rulings. The legislature, by the amendment of 1947, modified the requirement as to objections to instructions. As the section now reads objections to the giving of instructions, if they are to be questioned, are necessary, but the grounds of the objections need not be stated. The rule now is the same as it was before the new civil code was enacted in so far as objections to instructions are concerned, but exceptions to the rulings of the court need not be made. We think this is clear from a reading of Sec. 122. We therefore hold that the defendant is in no position to ask an appellate court to declare an instruction to be erroneous to which no objection was made at any time during the trial.

Defendant relies upon the case of Harding v. Mo. Pac. R. Co., 232 Mo. 444. In that case it was held that an exception taken to the giving of an instruction was sufficient. The case does not aid the defendant. It was expressly held in that case that an exception to the ruling of the court in giving an instruction was necessary. Sec. 122,

584

supra, provides that exceptions are no longer necessary, but provides further that where exceptions were formerly required objections must now be made. Therefore the Harding case supports our holding that an objection to an instruction is necessary to preserve the question for review.

██ Defendant at the close of all the evidence asked the court to direct a verdict in its favor on the theory that plaintiff failed to sustain either charge of negligence as submitted to a jury under the humanitarian doctrine. This request for a directed verdict was over-ruled. The point was preserved for review. The ruling of the court was correct because, as we have ruled, plaintiff did make a case for the jury on failure to warn the deceased of the oncoming train. That ruling of the trial court cannot be set aside and held to be erroneous even if we conclude that plaintiff failed to sustain the charge of failure to slacken the speed of the train.

The judgment is therefore affirmed. *Bohling* and *Barrett, CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. *Ellison, J.*, and *Tipton, P. J.*, concur; *Leedy, J.*, absent.