236 S.W.2d 758 (1951)
BRAY
v.
ST. LOUIS-SAN FRANCISCO RY. CO.
No. 6928.
Springfield Court of Appeals, Missouri.
February 7, 1951.
*760 Riddle & Baker, Veryl L. Riddle and Charles H. Baker, all of Malden, and Tom R. R. Ely, St. Louis, for appellant.
E. G. Nahler, St. Louis, Ward & Reeves, Caruthersville, for respondent.
McDOWELL, Judge.
This is an appeal from the action of the trial court in sustaining defendants' motion for a new trial. Plaintiff's petition was filed March 5th, 1948, in the Circuit Court of Dunklin County, Missouri. He sought to recover damages for personal injury and to his automobile on the grounds of primary negligence and the humanitarian doctrine. Defendants' answer was a general denial of all the allegations in plaintiff's petition and defendant, Railway Company, filed a counterclaim for damages to its train based upon primary negligence and the humanitarian doctrine. Judgment and verdict was for plaintiff in the sum of $4500 for personal injuries and $500 damages to plaintiff's automobile. Defendants' motion for new trial was sustained by the court on the grounds that plaintiff's evidence failed to show liability and that the trial court erred in giving plaintiff's instruction numbered 1. Plaintiff appealed.
Defendants bring up additional assignments of error, set out in the motion for new trial, to justify the action of the trial court in granting them a new trial. These additional assigned reasons complain of the trial court's actions in giving Instructions Nos. 4, 5 and 6 for plaintiff.
In our opinion we will refer to the parties as plaintiff and defendants or defendant-Railway Company.
We are first met in this case with defendants' request to dismiss plaintiff's appeal because of violation of Supreme Court Rule No. 1.04, in that the transcript on appeal does not contain the judgment of the trial court nor order of the trial court appealed from nor notice of appeal, and, for the further reason that the transcript was filed more than ninety days after the filing of the notice of appeal in the trial court, there being no extension of time for the filing of the transcript either by the trial court or the appellate court. Supreme Court Rule No. 1.04 provides:
"(a) * * * The transcript on appeal, required by Section 135 (1943 Act) [R.S. Mo. 512.110], as amended, shall always include, in chronological order, the pleadings upon which the action was tried, the verdict, the findings of the court or jury, the judgment or order appealed from, motions and orders after judgment, and the notice of appeal, together with their respective dates of filing or entry of record. In the event that the trial court extends the time to file the transcript, such orders and the dates thereof shall be included in the transcript. The transcript shall also contain all of the record, recitals, proceedings, and evidence necessary to the determination of all questions to be presented to the appellate court for decision, * * *."
It is true, as complained, that the plaintiff has utterly failed to comply with Supreme Court Rule No. 1.04. The transcript filed does not contain a copy of the judgment. It does not show that judgment *761 was ever entered by the court. It does not contain a copy of the order granting a new trial nor does it contain the notice of appeal. The transcript, itself, was not filed within ninety days after the filing of notice of appeal as provided in Civil Code, Section 137, Laws of Missouri 1943, p. 394, Mo.R. S.A. § 847.137, R.S.1949, § 512.130. There were no extensions of time either by the trial court or by this court. We understand, under the law, that the cause of action could be dismissed for this violation but we hold that, since the transcript is before us and that it does contain all of the record, recitals, proceedings and evidence necessary to the determination of the alleged errors in the case in order that substantial justice may be done and the cause decided on its merits, we will deny this objection.
The first assignment of error complains that the trial court erred in sustaining defendants' motion for new trial because the evidence failed to make a submissible case.
The law governing the sufficiency of the evidence is well stated in Ford v. Louisville & N. R. Co., 355 Mo. 362, 196 S.W.2d 163, 167:
"`It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.'"
In considering the sufficiency of the testimony, the evidence of the plaintiff is to be taken as true and all reasonable inferences that can be drawn therefrom and any evidence offered by the defendants that supports plaintiff's case. Young v. Wheelock, 333 Mo. 992, 64 S.W.2d 950.
It is true as contended by defendants that the trial court has a wide discretion in passing on a motion for a new trial, and, where such a motion is sustained, the appellate court will be liberal in upholding the trial court's action. That is because the trial court is present and hears the testimony and is in a better position to judge the effect of any error and granting a new trial is the exercise of judicial discretion unless abused or clearly erroneous. Teague v. Plaza Express Co., 356 Mo. 1186, 205 S.W.2d 563, 566; Thompson v. St. Joseph Ry., Light Heat & Power Co., 345 Mo. 31, 131 S.W.2d 574; Castorina v. Herrmann, 340 Mo. 1026, 104 S.W.2d 297; Taylor v. Farmers Bank of Chariton County, 349 Mo. 407, 161 S.W.2d 243; Schipper v. Brashear Truck Co., Mo.Sup., 132 S.W.2d 993, 125 A.L.R. 674.
However, where the cause is tried before a jury, the trial court cannot substitute his judgment for the findings of the jury on the facts and, if there was substantial evidence to support the verdict, that is evidence upon which reasonable minds could differ, the trial court would not be justified in setting aside the findings of the jury as to the facts in the case.
Guided by the law we here set out the facts from the record most favorable to the plaintiff to determine whether or not plaintiff made a submissible case or whether the trial court erred in finding that the evidence did not show liability on the part of the defendants when he sustained the motion for new trial.
The only issue submitted to the jury was whether or not defendants were liable under the humanitarian doctrine. The record clearly shows that plaintiff was guilty, as a matter of law, of contributory negligence and, therefore, could not recover under the allegations of primary negligence in his petition, so the question to be determined is whether or not, under the humanitarian rule, there is substantial evidence to support the verdict and judgment in this case.
*762 Carl Bray, plaintiff, testified that on March 5, 1948, he was involved in an accident, which occurred on Highway No. 53, near Gibson, in Dunklin County. At the time of the accident he was traveling southeast in a 1939 Dodge car in company with his wife and baby; that he was traveling at a speed of about 65 miles per hour a quarter of a mile before he reached the railroad crossing. He stated he first saw the Moose train when he was in about 60 feet of the crossing and, at that time, he was traveling about 60 miles an hour; that he applied his brakes, which were hydraulic and new; that there was nothing in his way and that the train, when he first saw it, was going between 25 and 30 miles an hour; he stated that he kept his eye on the Moose and saw the engineer in the cab; that the train did not slow up any after he saw it when it was 60 feet away and was traveling 25 or 30 miles an hour at time of accident. He stated he skidded his car on the highway and was traveling about 30 miles an hour when he struck the train; that he did not hear the whistle blow or bell ring; that his car was closed, excepting the ventilator was open; that he had heard the whistle before but no alarm was given at all; that he hit the Moose around where the engineer sits, about 15 feet from the front end, 10 or 15 feet. He stated his car was turned upside down and he didn't know anything after he hit the train. There is no question as to the injuries and, therefore, we will not state that part of the testimony.
On cross-examination, plaintiff testified that he was 43 years of age and an experienced driver; that he had been over this highway a few times, not too many times, and had lived in Dunklin County six years. He stated he knew the railroad was there and knew the Highway Department had a railroad crossing sign up there; that he knew the railroad sign was up there and guessed that it was 200 feet from the crossing but didn't know exactly how far. He stated that when within 200 feet of the crossing, he knew he was going to pass over a railroad track; that he didn't see a train; that there were some corn stalks between him and the railroad track; that there was something to block his view on that day; that he didn't know what time the train ran but he did know that it did come up to Campbell. He testified there were some high weeds along the road at the time of the accident, which would obstruct his view; that the highway was on an elevation and that the railroad was also on an elevation. He stated that his hearing was all right but he did not know how quickly he could stop his car; that the accident occurred about 4:15 P. M.; that it was cloudy but the pavement was dry, the road was an asphalt pavement; that it was daylight at the time. He testified he looked for the Moose but didn't see it; he stated he did not reduce his speed until he saw the train about 65 feet before he reached the crossing and that, at that time, the train was starting across the road; that the train got there before he did; that he turned his car to the right and hit the Moose on the left front side. He testified that when he reached a point 100 feet north of the crossing he could have seen the train had he looked but he didn't know whether he could have seen it when he was 200 feet from the crossing. He stated that the track of the railroad made a ninety degree curve at the place where the road crosses it and that the Moose was making the turn. He stated he had started to the show at Kennett. When asked how long after he passed the sign on the road was it until he looked for the train, he stated that he looked but that he looked in the wrong direction and that that was the reason he didn't see it.
Chester Harper testified that he was traveling in his automobile about 35 miles an hour, coming from the south, when he first saw the Moose train and plaintiff's car. From his position he thought plaintiff was traveling about 40 miles an hour and that the train was traveling from 30 to 35 miles an hour. He stated the train continued its same speed; that he saw plaintiff's car swerve when it was within about 40 feet of the crossing. He could not tell that an accident was going to happen until it happened; that he did not hear the Moose throw on its brakes until after it hit the crossing; that the train did not slow up at that particular point. He stated he did hear the brakes go on at the crossing; that *763 he was 140 feet away from the train and did not hear the whistle blow nor the bell ring; that he could see the train a half-mile or more down the road; that there were no obstructions to prevent plaintiff from seeing the train that he could remember of; that the lands were cultivated lands. He stated that there were no obstructions for a quarter of a mile north of the crossing to prevent plaintiff from seeing the train excepting a house and that it looked to him like plaintiff did not start to stop until he was within 40 feet of the track. He thought the plaintiff should have stopped his car within 15 feet; that the pavement was dry at the time; that it wasn't raining; that the highway is a level highway and the railroad tracks were level.
J. L. Petty testified for plaintiff. He was patrolman for Missouri State Highway Department. He testified he investigated the accident March 5, 1948; that he was familiar with this crossing and the highway at this point; that the highway was new and it was elevated north of the crossing; that it is higher than the railroad where it comes from the northwest and the road is higher than the crossing; that the railroad was somewhat elevated as it approached the crossing. He stated that he measured the skid marks left by plaintiff's car, just north of the crossing and that they were 60 feet long on both sides. He did not see the accident. He gave this testimony:
"Q. Did Mr. Bray make any statement to you? A. Yes, sir.
"Q. What did he say with reference to the cause of him running into this train? A. He said he just didn't see the Moose until he was right upon the crossing and the train."
He stated the railroad crossing sign was about 300 feet back on the highway from the crossing on the north side. He also stated the railroad maintained a cross-arm sign at the crossing. He gave this testimony:
"Q. Tell the jury whether or not there were any obstructions at all between Mr. Bray and the approaching train from the east? A. I didn't see any.
"Q. How far back could Mr. Bray have seen the Moose if he had been on the lookout? A. Several hundred feet.
"Q. And the Moose was in plain view any place along there? A. Yes, sir."
This witness testified that the Highway Department put up signs on the highway and that the Railroad Company put up their crossing signs.
J. Carl Todd testified for plaintiff. He stated he was a school teacher, employed at Bragg City, and was a passenger on the Moose at the time of the accident. He stated he was seated on the west side of the coach and saw plaintiff coming on the road from the west; that he judged plaintiff's car was about 400 yards from the crossing when he first saw him traveling pretty fast; he stated he kept his eye on the car until the Moose made the curve and that he could not tell that it slackened its speed. He stated that when he first saw the car he heard the whistle on the train blow, along about the ditch, about a quarter mile from the crossing; that he never heard it blow after that, neither did he hear the bell ring. He stated that from the time he saw the car until the accident there wasn't a sudden application of the brakes. He said the motor was cut off when the train started around the curve but the speed was not slackened.
Mrs. Mary Todd testified for plaintiff that she was a housewife, living in Gibson, about a quarter or half mile north of the railroad crossing. She saw the train on the day in question and heard the whistle blow a quarter of mile from the crossing; she was out in the yard but did not hear the whistle blow after that. She said she thought she could have heard it had it blown.
Leonard Belt testified for plaintiff. He lived in Gibson about straight west from the crossing; that he saw the accident and, at the time, was about 150 yards away, saw the train when it was near the crossing and judged that it was going about 25 miles an hour. He could not say whether it slowed up for he was looking at the car to see if it was going to cross in front of the train.
*764 He said he paid no attention to the train. He stated he did not hear the noise of the applying of brakes on the train until after the accident. He could not swear whether the whistle was blowing or bell ringing as he paid no attention to that. He stated there was nothing to keep Mr. Bray from seeing the train coming up the track; that he thought he could have seen it 300 feet away.
Plaintiff introduced a part of a deposition given by defendant, Slaughter, the engineer on defendant's train. He testified that he was operating a gas-electric locomotive, the same as a diesel; that at the time of his accident he had standard Westinghouse brake, air brake, in good working order; that the train was composed of the motor and one coach. He stated the train was on time and the accident happened about 4:20 o'clock P. M. He stated that Highway 53 crossed the railroad running in a southerly direction in about the center of a long curve of the railroad where it curves from the west to the south. He stated that he did not apply his brakes until he saw the automobile approaching. He gave this testimony:
"Q. Where were you when you saw this automobile? A. Well, I was six or 700 feet east of the highway.
"Q. Six or 700 feet from the intersection? A. From the intersection, yes.
"Q. Was that the first time you saw this automobile? A. No. I saw the automobile when he was approximately 1800 feet from the crossing. I saw there was traffic. Of course, it was the same automobile. It was the only one going south. I watched him all the way around the curve there.
"Q. Could you estimate how fast he was going when you first saw him? A. I judge he was going around 50 or 55 miles per hour. Of course, that was my judgment.
"Q. Where were you? A. I was around 1,000 feetbetween 800 and 1,000 feet when I saw the automobile coming.
"Q. And he was about 1800 feet? A. Yes. That is my judgment."
The witness testified that he did not do anything at that time; that the first act he performed was to shut off his motor about 600 feet from the crossing. He stated the automobile was coming closer and that he was watching it. He gave this testimony:
"Q. You blew the whistle from the whistle board clear on up to the crossing? A. Almost continually.
"Q. But you didn't apply the brakes until you were about 300 feet from the crossing? A. No.
"Q. When you applied them you didn't put them on full at that point? A. No.
"Q. Did you apply your brakes at any time after that 300-foot point? A. When in my judgment there was going to be a collision or a near collision I applied the brakes in emergency.
"Q. I mean on this particular did you apply the brakes again, or do you remember? A. Well, I don't remember. When I was approaching this crossing and saw it looked like we was going to have an accident I applied the brakes in emergency, and I had already slowed my speed down to about the required speed for this curve.
"Q. You had slowed your speed to what you normally make that curve at? A. Yes. With the first application.
"Q. Well, how did you apply them the second time? A. In emergency."
The witness testified that when the brakes were applied in emergency they made some noise but ordinarily not noticeable from outside observation. He testified that plaintiff's automobile struck the locomotive about five feet, seven inches from the front end. The witness also gave this testimony:
"Q. When did you first apply your brakes? A. Well, I made a little application of the brake around, oh, 300 feet, I guess, from the intersection.
"Q. Can you tell us about how much that slowed your speed down when you applied your brakes? A. Well, I slowed the speed of the train approximately five ro six miles an hour.
"Q. So that you were going about how fast at that 300-foot point? A. About 30 to 32 miles an hour.
"Q. After that 300-foot point did you apply your brakes again? A. Not until I saw that he hadn't slackened his speed.
*765 "Q. Where were you then? A. Well, I judge I was about 40 to 60 feet.
"Q. From the crossing? A. From the intersection."
This witness testified that plaintiff did not slacken his speed until he was within 70 or 80 feet of the crossing; that he blew his whistle approximately a quarter mile from the intersection and, upon approaching the intersection, he started to whistle for the crossing at the whistle board, which was about 500 feet from the crossing. He stated that he continued to blow the whistle because he saw the car was coming at a high rate of speed and was trying to warn him. He stated that he blew the whistle almost continuously up to the crossing. The witness gave this testimony:
"Q. How far were you from the crossing when you applied the brakes the second time? A. I judge I was 40 to 50 feet from the crossing."
The trial court, in sustaining the motion for new trial, found that this testimony did not show liability, as one of the grounds for his action.
The question before us, as to this assignment of error, is, does this testimony constitute substantial evidence under the humanitarian doctrine to show liability?
In Knorp v. Thompson, 352 Mo. 44, 175 S.W.2d 889, 899, the court states the law:
"The constitutive facts of a humanitarian case are: `"(1) Plaintiff was in a position of peril; (2) defendant had notice thereof (if it was the duty of defendant to have been on the lookout, constructive notice suffices); (3) defendant after receiving such notice had the present ability, with the means at hand, to have averted the impending injury * * *; and (5) by reason thereof plaintiff was injured." Evidence tending to prove these facts makes a prima facie case for plaintiff. In some instances obliviousness of danger on the part of the plaintiff is necessary to make the situation in which he is placed one of peril. In such cases it is of course incumbent upon the plaintiff to make proof of the facts and circumstances tending to show obliviousness, not only for the purpose of establishing that he was in a position of peril, but to bring home to defendant a knowledge of his peril. In these cases, however, obliviousness is but a subsidiary or evidentiary fact, the perilous situation of plaintiff and defendant's knowledge of it are the ultimate, issuable facts.' Banks v. Morris and Company, 302 Mo. 254, 257 S.W. 482, 484."
In the case at bar the defendant had the duty to maintain a lookout for persons approaching upon the intersections of public highways with defendants' railway tracks. Womack v. Missouri Pac. R. Co., 337 Mo. 1160, 88 S.W.2d 368; Hencke v. St. Louis & H. R. Co., 335 Mo. 393, 72 S.W.2d 798.
There should be evidence, therefore, tending to show that defendants either knew or had constructive notice that plaintiff was in a position of peril. Knorp v. Thompson, supra, 352 Mo. 44, 175 S.W.2d loc. cit. 899, 900.
The court in the Knorp case made the following statement of law:
"`If the plaintiff is driving an automobile and has reached a position of such proximity to the path of the defendant's vehicle that even an immediate application of the brakes could not cause him to stop before the collision occurs, he is certainly in peril. * * * if a plaintiff is approaching the pathway of the defendant on a course which, unless he stops, will produce a collision and if he is at the time oblivious to the presence and approach of the defendant, this in itself will cause him to be in a position of peril * * *.' State ex rel. Thompson v. Shain, 349 Mo. 27, loc. cit. 34, 159 S.W.2d 582, loc. cit. 586.
"` * * * The defendant is entitled to assume that the plaintiff is paying or will pay reasonable attention to his surroundings; until he has reason to suspect the contrary, he has no reason to believe that the plaintiff is in any danger. Therefore, the defendant is liable only if he realizes or has reason to realize that the plaintiff is inattentive and consequently in peril. Thus, if an engineer of a train approaching a level highway crossing sees a traveler approaching the track on foot or in a vehicle, he is *766 not required to take any steps either to warn the traveler by an additional blast of his whistle or to bring the train under special control, since he is entitled to assume that the traveler has discovered or will discover the oncoming train and will stop before reaching the crossing. However, * * * if there is anything in the demeanor or conduct of the plaintiff which to a reasonable man in the defendant's position would indicate that the plaintiff is inattentive and, therefore, will or may not discover the approach of the train, the engineer must take such steps as a reasonable man would think necessary under the circumstances. * * *'"
The question in the case at bar is almost exactly like the issue decided in Knorp v. Thompson, supra. In that case, 175 S.W. 2d on page 900, the court states the question thus:
"Does the record show facts from which it may be inferred that the defendant (1) knew of or had discovered the peril of the deceased, or that the defendant (2) could have discovered the peril of deceased by the exercise of ordinary care at a time after which the defendant had the present ability, with the means at hand, to have averted the impending injury?"
That is the question before us. Undoubtedly, in the case at bar, the peril of the plaintiff arose from the fact that he was oblivious to the danger and there should be evidence tending to show that the defendant, Slaughter, who was the engineer of defendant's train knew or had constructive notice of the plaintiff's obliviousness, in time to have averted the impending injury, as, in the Knorp case, did the defendants know of or discover plaintiff's peril in time to have averted the impending injury.
Defendants challenge the sufficiency of the evidence to make a submissible case. We have rather fully set out the testimony offered by plaintiff to establish negligence under the humanitarian doctrine.
To show liability, plaintiff's testimony is that about 4:15 P. M., March 5, 1948, he started from his home in Campbell, Dunklin County, to Kennett, to attend a show; that he was driving south on Highway No. 53, on an asphalt pavement, 22 feet wide, in his Dodge automobile, accompanied by his wife and baby. As he approached the intersection of this highway with defendant's railroad tracks, near Gibson, in Dunklin County, he was traveling at a speed of about 65 miles an hour, when a distance of a quarter of mile from said railroad crossing. There was a highway sign warning of the railroad crossing on said highway about 300 feet from the crossing, also a railroad sign. There was a railroad crossing sign at the crossing. Plaintiff first saw defendant's train when he had reached a distance of about 60 feet of the crossing and was at the time traveling about 60 miles an hour. He applied his brakes, which were in good condition, and left skid marks on the highway 60 feet long to the place where he collided with the train. The train was entering the intersection at the time plaintiff first saw it, and his automobile struck the front of the engine, just below the cab where the engineer rides, plaintiff stated about 15 feet from the front, but other evidence showed about 5 or 6 feet from the front of the engine. The evidence is undisputed that the country is level where the railroad tracks cross the highway near Gibson and that the highway is somewhat elevated above the surrounding country as is the railroad track coming from the north. The evidence shows that the tracks of the railroad, shortly before it intersects with the highway at Gibson, runs almost directly west and some 600 feet before it reaches the crossing, makes a large curve to the left or south and that the highway intersects the railroad tracks in this curve. Plaintiff's testimony is that he did not see the train; that his car windows were up but that the ventilator was open and he did not hear the train whistle nor the bell ring. When he first saw the train it was running about 25 or 30 miles an hour and did not slacken its speed until after the collision. He stated that he did not look to the north and that the reason of the collision was that he did not see the train until he was right up on the crossing. He stated that he looked but that he looked in the wrong direction. *767 Plaintiff's testimony is that he put on his brakes when he first saw the train, which slowed his speed to about 30 miles an hour when he struck the engine. Plaintiff testified that the engine was entering the intersection when he first saw it. The testimony on the part of the plaintiff showed that defendant's train whistled for the crossing about a quarter of a mile north; that as the train entered the curve approaching the crossing, he shut off the motor and when he was in about 300 feet of the crossing, he put on his brakes slightly and reduced the speed of the train to about 30 or 32 miles an hour. Plaintiff's witnesses testified that they heard the emergency brakes go on as the train entered the intersection where the collision occurred. Some testified that they did not hear the bell ring nor the whistle blow.
Plaintiff introduced the deposition of defendant Slaughter, the engineer, who testified that, when he was between 800 and 1,000 feet of the intersection, he looked toward the highway and saw plaintiff driving his car south toward the intersection, about 1800 feet from it, he judged his speed at the time was about 50 or 55 miles per hour. He stated he did nothing at that time because he saw no danger. The engineer stated that when he entered the curve, some 600 feet from the crossing, he shut off his engine and was coasting into the town; that he kept watching the automobile, which continued toward the crossing at about the same speed. He stated when he was within about 300 feet of the crossing, he slightly placed on his brakes, reducing his speed some 5 or 6 miles an hour, to about 30 or 32 miles an hour. He stated that there was no obstruction to keep plaintiff from seeing the train for several hundred feet before he reached the crossing; that the train was in plain view of plaintiff's car and the highway. The evidence seems to be undisputed that there was nothing to prevent plaintiff from seeing the train when he was within 300 feet of the crossing and from there to the crossing. The engineer testified that he blew his whistle almost continuously after he reached within 300 feet of the crossing and that the bell was ringing all the time. He stated that he applied his emergency brakes when it looked like there was going to be an accident, which was about 40 or 60 feet from the crossing. He stated that plaintiff did not slacken his speed until he was within 70 or 80 feet of the crossing. The evidence is that the train stopped in about 180 feet from the crossing and it contained the engine and one coach.
When the defendant's train was approaching the crossing, in the level country, and the engineer saw plaintiff's automobile approaching the crossing from the north, some 1800 feet therefrom, he was not required to warn plaintiff by any additional whistle or to bring his train under any special control since he was entitled to assume that the traveler had discovered or would discover the oncoming train and stop before reaching the crossing. There were warning signs on the road within 300 feet of the crossing and, at least, until after plaintiff had passed these warning signs, was there anything in his conduct or demeanor which, to a reasonable man in the defendant's position, would indicate that the plaintiff was inattentive and would not discover the approach of the train? The engineer was only under a duty to take such steps as a reasonable man would think necessary under the circumstances. Poague v. Kurn, 346 Mo. 153, 140 S.W.2d 13; Knorp v. Thompson, supra.
Defendants' duty to use care to avert injury under the humanitarian doctrine arises only on the discovery of peril, or on negligence in discovering it when there is a duty to keep a lookout and make discovery of the peril. State ex rel. Fleming v. Bland, 322 Mo. 565, 15 S.W.2d 798, 800.
The defendants, under the humanitarian doctrine to be free from negligence, must act on reasonable appearances and at a time when action would be effective. Allen v. Kessler, Mo.Sup., 64 S.W.2d 630, 633; Perkins v. Terminal R. Ass'n of St. Louis, 340 Mo. 868, 102 S.W.2d 915.
Since the peril of the plaintiff arose from the fact that he was oblivious to the danger, *768 there should be evidence to show that defendants knew or had constructive notice of plaintiff's obliviousness in time to have averted the impending injury. The only evidence, plaintiff offered, which would have made it reasonably apparent to a reasonable man under the circumstances in which the engineer of this train was acting to show that plaintiff was oblivous of the danger of the approaching train, was that he was approaching the railroad crossing from the north on a 22 foot asphalt road in plain open view of the approaching train at a speed of 65 miles an hour or about 95 feet per second; that he did not check his speed until he was within 60 or 65 feet of the crossing and the physical facts show that the skid marks on the road left by plaintiff's car extended from the crossing back up the road 60 feet on both sides, showing that was the place where the application of the brakes became effective. Under the testimony of plaintiff the train, when it entered the intersection, was traveling 25 or 30 miles per hour, at approximately 44 feet per second. Defendant, engineer, testified, in his deposition offered by plaintiff, that he discovered the peril of plaintiff 40 or 60 feet from the crossing and immediately applied the emergency brake. Plaintiff's witnesses testified that they did not hear the application of the brakes until the train entered the intersection. It is known that, even when emergency brakes are applied, it takes a little time before they become effective and if the train were within 60 feet of the crossing when the brakes were applied, the train would probably be near the intersection when they became effective. Likewise, it is well known that if plaintiff's car skidded 60 feet from the crossing that he had observed the train some distance before the skid marks started for the reason it takes a short time to make the brakes become effective. Does the evidence show, under the circumstances in this case, that defendants, by the exercise of reasonable care, could have discovered the perilous condition of plaintiff in time to have averted the collision? It must be remembered that this accident occurred at a level intersection of the public road and the railroad, in daylight, when the public road was dry and when there was no obstruction to prevent the plaintiff from seeing the train in ample time to stop. Under these circumstances there is no doubt that any reasonable man in defendant's place would have assumed that plaintiff would stop and this, coupled with the fact that the train was much nearer the crossing than plaintiff's automobile, we think the trial court was justified in stating that plaintiff's evidence did not make out a case of liability and in granting a new trial in this case for that reason.
We think the plaintiff did not make a prima facie case under the humanitarian rule. Hensley v. Dorr, Mo.App., 202 S.W.2d 553, 556; Kirkpatrick v. Wabash R. Co., 357 Mo. 1246, 212 S.W.2d 764, 768.
Plaintiff's second allegation of error is that the trial court erred in granting a new trial because plaintiff's instruction No. 1 was erroneous.
We find that the trial court was justified in granting defendant a new trial because of the error in plaintiff's instruction No. 1. It will be noted that this instruction merely tells the jury the law without predicating their findings upon facts in the case. The instruction states, " * * defendant, C. O. Slaughter were under the duty to use any or every means at hand of which they were possessed, with safety to himself, his passengers and his train, * * * to prevent said collision." At the bottom of the instruction, it states:
"You are further instructed that if you find and believe from the evidence that the defendant railroad's employees and defendant C. O. Slaughter, neglected and failed to use any, or every means at hand of which they were possessed, with safety to himself, his passengers and to his train, if you find, which a reasonably prudent man in the same or similar circumstances would believe to be necessary to avert the collision, if you so find, and that as a direct result of such failure or neglect, if you so find, the plaintiff was injured * * *, *769 then your verdict must be for the plaintiff, Carl Bray, * * *"
This gives a roving commission to the jury to determine what means might arise in their mind that the defendants had at hand to use in protecting plaintiff. Plaintiff cites Gray v. Columbia Terminals Company, 331 Mo. 73, 52 S.W.2d 809, 812. It will be noted in this case that the instruction given has the following in it:
"`* * * in time thereafter by the exercise of ordinary care and with the means at hand and with safety to the occupants of said tractor * * * to have checked the speed, stopped said automobile tractor or sounded a warning and thereby have avoided striking Gray,'"
This predicates the finding of the jury upon facts. If the instruction had said that the defendants discovered the peril of plaintiff in time to have warned him by the sounding of the bell or whistle or by applying the brakes and checking the speed of the train and by so doing could have avoided the injury, then the instruction would have been good. But instruction No. 1 merely tells the jury what the law is and gives them a roving commission to find such facts as they may in making the application thereof. The instruction is clearly erroneous. Kirkpatrick v. Wabash R. Co., supra, cited by plaintiff to sustain Instruction No. 1, does not discuss anything but the law.
In Todd v. St. Louis-San Francisco Ry. Co., Mo.Sup., 37 S.W.2d 557, 561, the court does not sustain plaintiff's contention that a general statement of the law in the instruction is proper. We quote:
" * * * The humanitarian doctrine calls into action every means at hand to prevent the threatened injury, and this may be accomplished by giving an alarm or slackening the speed of the train as well as by stopping."
This clearly shows that the instruction should be predicated upon facts.
We cannot agree with plaintiff that this error was harmless. We hold that the trial court was in a better position to judge whether or not the instruction was harmless than this court and we hold that the trial court's judgment should be affirmed.
We also disagree with plaintiff that there was no objection made to the giving of the instruction. It is true that under the law, as it now exists in Missouri, objections must be made to instructions. It is no longer necessary to make specific objections but the amending of the law did not do away with the requirement that objections must be made. However, we hold in this case, that where the trial court had a rule that general exceptions were saved to the giving of instructions, that sufficiently complied with the law. We agree with the law as set out in the cases cited by plaintiff of Ragsdale v. Young, Mo.App., 215 S.W.2d 514, and Holdman v. Thompson, 358 Mo. 577, 216 S.W.2d 72; Supreme Court Rule 3.21; Section 847.122, R.S.Mo.1939, as amended by the Laws of Missouri 1947, Vol. I, p. 227, R.S.1949, § 510.210. We think it unnecessary to go into all the cases cited under our ruling herein.
Defendants complain of the court's action in giving plaintiff's Instructions numbered 4, 5 and 6, as additional reasons for the granting of a new trial.
Instruction No. 4 reads as follows:
"The court instructs the jury that it is the duty of the defendant, its agents and employees in charge of the operating its locomotive engine and train in approaching a public crossing to keep a continuous lookout for persons and vehicles and to sound its whistle at least eighty (80) rods or one quarter of a mile from the crossing and continue to sound the whistle at intervals until the train shall have passed the crossing, or to ring its bell continuously from at least eighty (80) rods or one quarter of a mile from the crossing until the train shall have passed the crossing."
This instruction is clearly erroneous. The defendants' duty to sound the whistle 80 rods before he reached the crossing has nothing to do with liability under the humanitarian doctrine. Even if the defendants had been negligent in not so sounding the whistle, such negligence would not *770 constitute liability under the humanitarian doctrine. In Knorp v. Thompson, supra, 175 S.W.2d at page 899, the court says:
"The constitutive facts of a humanitarian case are: `"(1) Plaintiff was in a position of peril; (2) defendant had notice thereof (if it was the duty of defendant to have been on the lookout, constructive notice suffices); (3) defendant after receiving such notice had the present ability, with the means at hand, to have averted the impending injury * * *;"'"
It is clear from the law that before defendants are liable in the case, plaintiff must show that he was in a position of peril, and, secondly, that the defendants had knowledge or constructive knowledge. We submit that the blowing of the whistle 80 rods from the crossing would have nothing to do with liability for there can be no liability until the plaintiff reached a place of imminent peril and the defendants were under no obligation to sound a whistle or ring a bell until they had notice of such peril in order to prevent the injury. It can clearly be seen that this instruction related only to the question of primary negligence which was not submitted in the case. It could only confuse the jury as to the constitutive facts necessary to establish liability under the humanitarian rule and, for that reason, the trial court would have been justified in granting a new trial. State ex rel. Fleming v. Bland, supra.
Instruction No. 5 is as follows:
"The court instructs the jury that under the law when a servant, or employee negligently injuries a person while acting in the course of his employment, both the employer and employee are liable for such injuries.
"You are further instructed that in this case, if you believe and find the defendant, C. O. Slaughter, was on March 5, 1948, the employee of the defendant, St. Louis-San Francisco Railway Company, if he was, and if in the course of his employment, if he was employed, he carelessly and negligently inflicted the injuries to the plaintiff, if you so find, as set forth in the other instructions herein given, then defendant, St. Louis-San Francisco Railway Company, is liable for such injuries, if any."
This instruction is erroneous for it tells the jury that the defendant, Railroad Company, would be liable if its engineer carelessly and negligently inflicted the injuries to plaintiff as set forth in other instructions. In instruction No. 4, which we have shown to be clearly erroneous, the jury is instructed that if the defendant fail to sound its whistle 80 rods from the crossing and to continue the sound of the whistle at intervals until the train passed the crossing or to ring the bell continuously from 80 rods from the crossing until it passed the crossing, defendant would be negligent. We have pointed out that this is not the law and the jury being so instructed were misdirected and confused as to the issues in this case so far as the humanitarian rule is concerned. The defendants were not under any obligation to sound a whistle or ring a bell until the plaintiff was in imminent peril and neither actual nor constructive notice was had by defendants of such peril. This instruction, likewise, is confusing, misleading and error, which would justify the trial court in granting a new trial.
Instruction No. 6 is as follows:
"The court further instructs the jury that by the term sole cause is meant acts or omissions of the plaintiff which solely caused his injuries without any negligence whatever on the part of the defendants as submitted in the instructions directly contributing to the plaintiff's injuries. Therefore if you find there was any negligence on the part of the defendant as submitted in the instructions which directly contributed in any degree to plaintiff's injuries, then you cannot find there were acts or omissions of plaintiff which solely caused his injuries."
We submit that this instruction should not have been given. Under the humanitarian rule plaintiff's negligence is not a defense. It is presumed that plaintiff was negligent in placing himself in a place of imminent *771 peril and being oblivious to the approaching train, and defendants became liable only by discovering this peril in time to avoid the injury by the use of every means at hand. Therefore, there is no liability on the part of the defendants unless they fail in their duty to plaintiff to use such means as they had at hand to avoid the injury if they can do so without injury to themselves or to their passengers.
This instruction is confusing. It has no place in the case and, as defendants state, if considered in connection with Instructions Nos. 4 and 5, which embrace primary negligence, the defendants would be left without defense. We agree that this instruction is highly prejudicial and constitutes error. State ex rel. Fleming v. Bland, supra.
Judgment affirmed.
VANDEVENTER, P. J., concurs.
BLAIR, J., concurs in results.